**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2411-15T3
    A-2550-15T1
    A-2551-15T3

STATE OF NEW JERSEY,

  Plaintiff-Respondent,

v.

JAMEL LEWIS, a/k/a ADUAL
LEWIS, TAREAK BOND, JAMAL
LEWIS, JAMIL LEWIS, KIREESE
OCONNER and KIRESE OCONNER,

  Defendant-Appellant.

_____

STATE OF NEW JERSEY,

  Plaintiff-Respondent,

v.

ROBERT HARRIS,

  Defendant-Appellant.

_____

STATE OF NEW JERSEY,

Plaintiff-Respondent,

v.

SHARIF TORRES,

Defendant-Appellant.

_____

Submitted December 4, 2018 – Decided January 7, 2019

Before Judges Fisher, Suter and Geiger.

On appeal from Superior Court of New Jersey, Law Division, Union County, Indictment No. 10-03-0288.

Joseph E. Krakora, Public Defender, attorney for appellants (Alison S. Perrone and Frank M. Gennaro, Designated Counsels, on the briefs in A-2411-15; Michael J. Confusione, Designated Counsel, on the brief in A-2550-15, and Michele A. Adubato, Designated Counsel, on the brief in A-2551-15).

Michael A. Monahan, Acting Union County Prosecutor, attorney for respondent (Milton S. Leibowitz, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the briefs).

Appellant Robert Harris filed a pro se supplemental brief in A-2550-15.

PER CURIAM

Defendants Jamel Lewis, Robert Harris, and Sharif Torres, separately appeal their convictions for offenses that led to and caused Tanya Worthy's death. We consolidate these appeals for purposes of affirming their convictions

and the sentences imposed in a single opinion. In doing so, we reject – among other things – defendants' arguments that the Supreme Court's recent decision in Carpenter v. United States, 585 U.S. __, 138 S. Ct. 2206 (2018) – which held that individuals possess a legitimate expectation of privacy in the records of their physical movements as captured by cell-site location information (CSLI), and that a government's acquisition of CSLI constitutes a Fourth Amendment search – requires a remand for further proceedings about the State's acquisition and use of CSLI at their trial.

On the evening of October 28, 2008, Tanya Worthy ate in a Newark restaurant, leaving about 6:15 p.m. She placed a take-out order for her boyfriend Rahim Jackson, with whom she lived in Green Brook, but, rather than wait, she asked the waitress to call her when the order was ready. She left the restaurant and was never seen alive again.

Jackson was home watching television. At about 8:40 p.m., he heard the garage door open and thought it odd that Worthy would be returning home, because he had earlier attempted to reach her several times without success and learned from the restaurant that she didn't pick up his order. He apprehensively opened a door to the garage and saw Worthy's car in the driveway. A masked individual, who was holding a gun, exited the car's passenger door and told him

3

not to move, but Jackson closed and locked the door. From inside the house, Jackson observed the masked individual re-enter the car, which then backed out of the driveway. Jackson ran to a neighbor's house and asked her to call police.

At 10:47 p.m., police and other responders arrived at a field opposite a parking lot in Elizabeth to find a white 2005 BMW convertible engulfed in flames. Once the blaze was extinguished, they discovered Tanya Worthy's severely-burned body lying face-down in the rear passenger seat. An investigation revealed she had been shot three times, twice in the chest and once in the abdomen, prior to being burned.

The State sought to prove at trial that Worthy was killed in the course of a robbery gone awry. Defendant Jamel Lewis, the State argued, had planned with his cousin Rashawn Bond to rob and then kidnap Worthy; they thought that in this way they could gain access to and rob Jackson, alleged to be a wealthy drug dealer. Lewis and Bond enlisted help from defendants Robert Harris and Sharif Torres, as well as Titus Lowery, an unindicted co-conspirator.

According to the State, while Worthy was visiting Bond, with whom she was also romantically involved, defendants and Lowery stormed in, robbed her, and kidnapped her, and then Lewis and Lowery drove away in her car, with Worthy in the back seat, from Bond's Newark residence to Jackson's Green

4

Brook residence. Bond, Harris, and Torres followed along in another car but didn't reach Jackson's residence in time to carry out the intended home invasion with Lewis and Lowery. Their plan botched, Lewis and Lowery fled Green Brook with Worthy still in the car, and Bond, Harris, and Torres changed course to meet up with them in Elizabeth to destroy the evidence, including Worthy and her vehicle.

The defense disputed any connection between or among defendants or between or among defendants and Worthy. But witnesses testified at trial, often with reference to photographs, that Bond and Lewis were cousins and close friends, that both were acquainted with Harris, and that Harris was acquainted with Torres. One witness in particular, Sean Williams, testified that he encountered Lewis, a family friend, at a party in Irvington three days prior to the crimes; at that time, Lewis asked Williams to steal a four-door vehicle that he needed to commit a "jux" – a home invasion and robbery – of "one of [Bond's] bitches." Lewis promised Williams that Bond would compensate him, but Williams ultimately declined to steal the car Lewis sought.

As for defendants' connection with Worthy, Bond's cousin Terron Billups confirmed that Worthy and Bond had been romantically involved. And Jasmine Campbell, another girlfriend of Bond's, found Worthy's business card in a black

leather handbag Bond gave Campbell just hours after Worthy's body was set on fire. The bag, which was eventually turned over to police, led the investigation to Bond and then defendants.

The State also relied at trial on CSLI for cell phones attributed to defendants and to Bond, Lowery, and Worthy, as well as on contemporary call records for the same phones, to piece together its case. Cell phones function by connecting to a series of antennae (cell sites) and continuously scan, regardless of whether the user is actively operating the phone, for the best signal, which often but not always emanates from the closest cell site. Carpenter, 138 S. Ct. at 2220-21. A record of the location and time is created each time a phone connects to a particular site, though the precision of the location data varies on the size of the geographic area covered by a site and the concentration of sites nearby. Id. at 2211-12.

A Sprint records custodian testified about CSLI and call records and the subscriber information for two accounts, one belonging to Worthy and used in connection with her employment and the other belonging to Lewis. Records custodians for Verizon Wireless and T-Mobile testified about their records and subscriber information on accounts belonging, respectively, to Bond and Karima Rose, who confirmed at trial that Harris was using her phone at that time. An

AT&T radio frequency engineer identified Torres as the subscriber of one of the company's accounts in the course of testifying to the records for that account, and a representative of the Philadelphia County Adult Probation Department testified, based on the department's records, about the phone number that Lowery provided to a probation officer who was collecting his basic contact information.

The AT&T and Sprint engineers were qualified as experts and permitted to provide opinions about the CSLI information. A representative of the Union County Prosecutor's Office testified about maps prepared by that office's Intelligence Unit that plotted the cell sites with which the phone for each account made connections during the night in question. The individual who created the maps testified that he prepared them based on CSLI records obtained from the service providers for the respective phones.

According to call records, Bond contacted Lewis, who then placed three calls to Harris during the afternoon. During a thirty-minute span beginning at around 5:30 p.m., while Worthy was at the Newark restaurant, Torres called Bond, who called Worthy, then Lewis, and then Worthy again. Around 7:00 p.m., both Worthy's and Bond's phones connected with a cell tower near Bond's Newark residence, supporting an inference that Worthy visited Bond after

7

leaving the restaurant. Thirty minutes later, Worthy's phone, along with those used by Bond, defendants, and Lowery, all connected with that same tower within a few minutes of one another.

Around 8:00 p.m., when the prosecution claimed the kidnapping occurred, the phones attributed to Lewis, Lowery, and Worthy began connecting with a westerly sequence of cell sites between Newark and Green Brook. Partway there, Worthy's phone abruptly ceased to track with the others and last connected with a site near the intersection of Interstate 78 and Route 24; her phone was later recovered by police on the side of the road in that vicinity.

Call records showed that while Lewis and Lowery were traveling with Worthy to Green Brook, Bond called Campbell – the girlfriend to whom he ultimately gave Worthy's handbag – several times, initially without success. Campbell testified that when Bond finally reached her at 8:19 p.m., he asked her to pick him up at a Newark intersection so she could lend him her car. She complied, and he left with her vehicle after dropping her off at her residence. CSLI records demonstrated that, soon thereafter, the phones attributed to Bond, Harris, and Torres all began connecting with a series of cell towers from Newark toward Green Brook.

At about 8:40 p.m., while the other three were on their way, Lewis's and Lowery's phones connected to a cell site across Route 22 from Jackson's Green Brook residence. That timing coincided with Jackson's recollection of when he encountered the masked individual, and briefly preceded his neighbor's phone call to police. Records confirmed that the neighbor's call was placed at 8:48 p.m. At the same time, phones belonging to Harris, Torres, and Bond were connecting to cell sites near Watchung, ten minutes' driving distance from Jackson's home. The same data revealed an abrupt change in direction after the neighbor's call to police, showing that the phones used by the three began connecting with an easterly sequence of cell sites back toward Newark. Around the same time, Lewis's and Lowery's phones connected with a series of sites headed in the same direction between Green Brook and Newark. Call records also showed that Lewis and Harris were in constant contact during this period.

CSLI revealed that defendants and their cohorts converged at approximately 10:15 p.m., when their phones connected with a cell site in Newark about a mile from where Worthy was found burned inside her car. Images of the fire were captured on a nearby parking lot's surveillance system; those images did not reveal the identity of any perpetrator. Afterward, Shakeerah Scott, the mother of Lewis's child, testified that she picked up Lewis

and two others at another Newark location; she gave them a ride to Lewis's car. Bond, meanwhile, returned Campbell's car to her at her house at 12:32 a.m., a time confirmed by the record of a phone call he placed to her announcing his arrival. When Campbell went outside to meet Bond, he handed her the car keys as well as the handbag in which she eventually found Worthy's business card.

Defendants Lewis, Harris and Torres – as well as Bond – were charged with: first-degree kidnapping, N.J.S.A. 2C:13-1(b); two counts of first-degree robbery, N.J.S.A. 2C:15-1(a); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); and second-degree aggravated arson, N.J.S.A. 2C:17-1(a).

Before trial, defendants moved, pursuant to Miranda v. Arizona, 384 U.S. 436 (1966) and Bruton v. United States, 391 U.S. 123 (1968), to suppress statements Torres made to police. At the hearing's conclusion, the judge determined that the statements could be admitted with certain redactions. At the conclusion of a lengthy trial, defendants were acquitted of the weapons offenses but convicted of kidnapping, felony murder, arson, and second-degree robbery.[1]

---

[1] Bond was separately tried and convicted of a similar set of offenses, and we separately disposed of his appeal. State v. Bond, No. A-2317-14 (App. Div. Oct. 18, 2017).

The trial judge denied their motions for judgment of acquittal or, in the alternative, for a new trial.

Lewis was sentenced to an aggregate life prison term, and Harris and Torres were both sentenced to aggregate sixty-year terms, all subject to a period of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2.

Defendants separately appeal. Lewis argues:

> I. DEFENDANT'S CONFRONTATION CLAUSE RIGHTS WERE VIOLATED BY ADMISSION OF A NON-TESTIFYING CO-DEFENDANT'S STATE-MENT TO POLICE.
>
> II. THE TRIAL COURT'S FAILURE TO DECLARE A HUNG JURY AFTER THE JURY WAS DEADLOCKED WAS ERROR THAT DENIED DEFENDANT A FAIR TRIAL.
>
> III. THE IMPROPER ADMISSION OF PHOTOS SUGGESTED GANG AFFILIATION DEPRIVED DEFENDANT OF HIS RIGHT TO A FAIR TRIAL.
>
> IV. DEFENDANT'S CONVICTIONS MUST BE VACATED BECAUSE THE STATE FAILED TO PROVE DEFENDANT'S GUILT BEYOND A REASONABLE DOUBT.
>
> V. THE PROSECUTOR EXCEEDED FAIR COMMENT ON THE EVIDENCE, THEREBY DEPRIVING DEFENDANT OF HIS RIGHT TO A FAIR TRIAL.

VI.   THE DISSEMINATION OF A PHOTOGRAPH OF THE DEFENDANT IN HANDCUFFS IN COURT AT HIS TRIAL DEPRIVED HIM OF A FAIR TRIAL.

VII.   DEFENDANT'S LIFE TERM IS MANIFESTLY EXCESSIVE AND REQUIRES A REMAND FOR RESENTENCING.

Harris argues:

I.   THE TRIAL COURT ERRED IN DENYING [HIS] MOTION FOR ACQUITTAL OR AT LEAST IN FAILING TO GRANT [HIS] MOTION FOR A NEW TRIAL IN LIGHT OF THE CUMULATIVE EFFECT OF THE TRIAL ERRORS BELOW.

A.   The Evidence Against [Harris] Was Insufficient As A Matter Of Law Or, At Least, Should Have Been Set Aside As A Manifest Denial Of Justice.

B.   The Photos Suggested Gang Affiliation For Defendant And Caused Him An Unfair Trial.

C.   Defendant's Confrontation Clause Rights Were Violated.

D.   The Prosecutor Exceeded Fair Comment On The Evidence And, Considering The At Best Thin Evidentiary Basis For Defendant's Guilt, Contributed To The Unfair Trial For Defendant Below.

E.   The Trial Judge Should Have Declared A Hung Jury; The Court's Instruction To The Jury In Response To The Announcement Of [A] Deadlock

12

Prejudiced Defendant's Right To Fair Jury Deliberation.

II. THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR MISTRIAL BECAUSE OF A BRADY[2] VIOLATION.

III. DEFENDANT'S SENTENCE IS IMPROPER AND EXCESSIVE.

In a pro se supplemental brief, Harris also argues:

I. THE TRIAL COURT'S INSTRUCTIONS UNCONSTITUTIONALLY RELIEVED THE STATE OF ITS BURDEN OF PROOF AND/OR SHIFTED THE BURDEN OF PROOF ON DEFENDANT ON ITS ACCOMPLICE LIABILITY CHARGE.

II. THE TRIAL COURT ERRED BY FAILING TO GRANT DEFENDANT'S MOTION FOR AN ACQUITTAL DUE TO INSUFFICIENT EVIDENCE TO SUPPORT THE CONVICTIONS.

And Torres argues:

I. THE DEFENDANT'S TWO STATEMENTS TO THE POLICE SHOULD NOT HAVE BEEN ADMITTED INTO EVIDENCE BECAUSE HIS FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION WAS VIOLATED.

II. THE TRIAL COURT'S FAILURE TO DECLARE A HUNG JURY AFTER THE JURY WAS DEADLOCKED WAS ERROR THAT DENIED DEFENDANT A FAIR TRIAL.

---

[2] Brady v. Maryland, 373 U.S. 83 (1963).

III. THE ADMISSION OF STATEMENTS MADE BY CO-DEFENDANTS LEWIS AND BOND AT TRIAL UNDER THE CO-CONSPIRATOR EXCEPTION TO THE HEARSAY RULE WAS ERROR THAT VIOLATED . . . TORRES['] CONSTITUTIONAL RIGHT OF CONFRONTATION.

IV. THE ADMISSION OF CERTAIN INFLAM-MATORY EVIDENCE OVER THE DEFENSE OBJECTION DEPRIVED DEFENDANT OF A FAIR TRIAL.

V. THE DISSEMINATION OF A PHOTOGRAPH OF THE DEFENDANT IN HANDCUFFS IN COURT AT HIS TRIAL DEPRIVED HIM OF A FAIR TRIAL.

VI. DENIAL OF THE DEFENDANT'S MOTION FOR NEW TRIAL WAS ERROR.

VII. THE AGGREGATE SENTENCE IMPOSED UPON THE DEFENDANT OF SIXTY (60) YEARS WITH THIRTY (30) YEARS OF PAROLE INELIGIBILITY WAS EXCESSIVE AND SHOULD BE MODIFIED AND REDUCED.

VIII. THE AGGREGATE ERRORS DENIED DEFENDANT A FAIR TRIAL.

After all briefs were filed, each defendant wrote to the court – pursuant to Rule 2:6-11(d) – to argue that Carpenter, which was decided after their convictions but while this appeal was pending, necessitates a remand so the trial court may decide whether the use of CSLI at trial violated their Fourth Amendment rights.

14

For the reasons that follow, we reject: (1) defendants' arguments that Carpenter requires a remand; (2) Torres's argument that the admission of statements he gave police violated his right against self-incrimination; (3) defendants' arguments that the admission of certain statements – Torres's statements, a statement made by Lewis, and another made by an alleged co-conspirator – violated their right to confront adverse witnesses at trial; (4) defendants' arguments that their right to a fair trial was impaired by the judge's decision not to declare a hung jury; (5) defendants' arguments that the admission of certain evidence and photographs suggested a gang affiliation and deprived them of a fair trial; (6) defendants' arguments that the evidence was insufficient to convict; (7) defendants Lewis and Torres's arguments that they were deprived of a fair trial because of the dissemination on social media of a photograph of them in handcuffs; (8) defendant Harris's argument that the judge abused his discretion in denying his motion for a mistrial because of an alleged Brady violation; (9) defendants Lewis and Harris's arguments that the prosecutor exceeded the bounds of advocacy during his summation; (10) defendant Harris's pro se argument that the judge's instructions shifted the burden of persuasion to him on accomplice liability; (11) all defendants' arguments that the cumulative

15                                                                    A-2411-15T3

effect of errors warrant either a judgment of acquittal or a new trial; and (12) all defendants' arguments that they received excessive sentences.

I

As noted above, because Carpenter was decided not only long after defendants' lengthy trial that started on February 25 and ended on May 20, 2015, but also well after the parties filed their appellate briefs, defendants did not raise the application of Carpenter – or the issues considered by the Court in Carpenter – until they filed their Rule 2:6-11(d) letters shortly after Carpenter was decided. Carpenter held that the Fourth Amendment encompasses a government's attempt to seek CSLI from third parties possessing such information because individuals possess a reasonable expectation of privacy in their physical movements as captured in CSLI. Carpenter, 138 S. Ct. at 2209-10. In response, the State argues there was no Carpenter violation because the State secured court orders – what it claims are the equivalent of search warrants – that approved the seizure of this information.

We decline to consider this untimely contention. To be sure, Carpenter was decided after this case was tried and during the pendency of these appeals. But by the time these defendants were tried, our Supreme Court had already

16

recognized a reasonable expectation of privacy and established a warrant requirement for similar information in State v. Earls, 214 N.J. 564, 584 (2013). Moreover, defendants never sought the suppression of the CSLI used at their trial, never objected to its admission, and, so, we are presented with no factual record by which to examine whether the principles upon which Carpenter was based were violated by the State's securing of this information. We conclude that the search and seizure issues that defendants raise for the first time on appeal were not properly preserved for appellate review. State v. Robinson, 200 N.J. 1, 20-22 (2009).

II

Torres argues the trial judge infringed his right against self-incrimination by admitting into evidence statements he gave police during two interviews. Torres has not asserted what part of the statements were of concern to him. In reviewing the statements, we note that Torres largely denied knowing defendants or the victim or claimed he had never been in Newark. He did, however, acknowledge ownership and primary use of a cellphone and he identified his service provider.

An accused enjoys a right against self-incrimination that is guaranteed both as a federal matter by the Fifth and Fourteenth Amendments, Malloy v.

Hogan, 378 U.S. 1, 6 (1964), and as a state matter by our common law and evidence rules, State v. Hartley, 103 N.J. 252, 260 (1986). In light of the inherently coercive nature of a custodial interrogation, an accused must be advised of the right to remain silent, that any statement may be used against the accused, and that the accused has the right to an attorney. Miranda, 384 U.S. at 444. An accused's invocation of those rights must be "scrupulously honored." Michigan v. Mosley, 423 U.S. 96, 103 (1975).

A trial court may not admit any incriminating statement the accused may make in the context of such an interrogation unless the accused was duly advised of and validly waived those rights prior to making the statement. Miranda, 384 U.S. at 444-45. The prosecution must prove the predicates for admission beyond a reasonable doubt and must establish any purported waiver was knowing, voluntary, and intelligent. State v. Presha, 163 N.J. 304, 313 (2000). Whether a purported waiver meets those criteria depends on

> the totality of the circumstances, including both the characteristics of the defendant and the nature of the interrogation. Relevant factors to be considered include the suspect's age, education and intelligence, advice concerning constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment and mental exhaustion were involved.
>
> [State v. Galloway, 133 N.J. 631, 654 (1993).]

At times, uncertainties arise as to whether an interview constitutes a custodial interrogation. According to the Supreme Court, a custodial interrogation is any "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444. There need not be a formal arrest or physical restraint, and the interrogation need not occur at a police station. State v. P.Z., 152 N.J. 86, 103 (1997). Absent a formal arrest, the "critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the status of the suspect, and other such factors," ibid., such that the restraint on the accused's freedom of movement is "of the degree associated with a formal arrest," California v. Beheler, 463 U.S. 1121, 1125 (1983); accord P.Z., 152 N.J. at 103.

A judge's findings of fact on these questions command our deference when supported by sufficient credible evidence in the record. State v. Elders, 192 N.J. 224, 242-44 (2007). A judge's conclusions as to matters of law, however, are not entitled to deference. State v. Shaw, 213 N.J. 398, 411 (2012).

At the <u>Miranda</u> hearing, the judge heard from a detective present for both of Torres's statements, as well as from Torres, and the judge reviewed the video recordings of both interviews. According to the detective, he and a colleague traveled to Philadelphia to interview Torres for the first time on April 22, 2009, after learning from a witness that Bond had used Torres's cell phone to call Worthy's cell phone on the night of the kidnapping and that CSLI records showed Torres's phone had been in Newark that night.

The two detectives, accompanied by Philadelphia police, visited Torres at his home, and he voluntarily agreed, albeit grudgingly, to accompany them to the police department; Torres's mother went along. Torres was informed he was not under arrest and was being interviewed as a witness for any information helpful in the investigation into Worthy's death. Torres agreed to be photographed, and he agreed the interview could be video-recorded, but he declined to sign a consent form. After a forty-five-minute interview, during which he provided information about his cellphone, Torres agreed to speak with the police again if they had any further questions. He then left the station freely.

On May 20, 2009, the detective and another officer, accompanied by Philadelphia police, again visited Torres at his home. Again, Torres grudgingly agreed to accompany them to the police department for another interview. He

was neither arrested nor charged with any offenses in connection with the homicide, but he was informed of his Miranda rights and presented with a form. He told the detective he understood his rights, but he declined to sign the form, explaining he didn't want to make a "statement," a word used on the form. When told by the detective that it "wasn't necessarily a statement" but an "interview," Torres agreed to be interviewed and to be video-recorded but would not sign the consent form.

During the course of the interview that followed, Torres stated at one point that he had "nothing to say." The detectives inquired whether he wanted to continue the conversation, and he assured them that he did. But eventually Torres made clear that he no longer wished to continue, and the detectives immediately ceased the interview. Though never explicitly told he was free to leave, Torres was never placed under arrest nor restrained in any manner. At the conclusion of the interview, he was permitted to leave and was given a ride home.

Torres was twenty years old at the time, had a tenth grade education, and had been arrested on several prior occasions. He testified at the hearing that he woke up on April 22, 2009, to find more than five police officers downstairs, others waiting outside, and his mother crying. He persistently refused to go with

21

them for an interview until his mother advised that he "had to go or they were going to lock [him] up."

Torres recounted that a similar series of events occurred ahead of the May 20, 2009 interview, noting that on this occasion police officers repeatedly insisted he "ha[d] to go down" to the police station each time he refused. According to Torres, on neither occasion did he believe he had any choice, nor did he feel free to leave. He signed no forms and, at the second interview, made clear he did not want to make a statement.

Based on his observation of the testimony and with the benefit of a review of the video recordings, the judge credited the detective's version of events over Torres's. The judge declared he was "satisfied beyond a reasonable doubt" that both statements were voluntarily given, noting that Torres was not in custody and that the record did not support a claim that Torres's will had been overborne. The judge held that Miranda warnings were not required on either occasion, but, even so, a Miranda warning was given on the second occasion, as was evident from the video recordings. The judge therefore determined that the statements were admissible subject to any redaction required by Bruton, 391 U.S. at 123.

Although the judge's ruling, as he acknowledged, was somewhat "perfunctory," Torres does not argue that the judge failed to render sufficient

A-2411-15T3

findings; he instead argues that the judge drew the wrong conclusion from the evidence. Torres contends that, on both occasions, a large police presence arrived at his home and brought him to the station, that he was interviewed by multiple officers, and that he was video-recorded despite his refusal to sign the consent form. On the first occasion, he emphasizes that he was given no Miranda warning at all and was told he was only being interviewed as a witness, yet he was questioned about information that became significant evidence against him at trial in an interrogation that was clearly designed or likely to elicit incriminating responses.

Torres acknowledges that warnings were given on the second occasion but asserts that he told the detectives several times that he did not wish to make a statement and that the police disregarded his "attempt to end the interrogation," and pressed him to continue, insisting that it was not a "statement" and reminding him that he was not under arrest. He further argues, given this evidence's significance in the context of a highly circumstantial case, that admission of his statements clearly caused prejudice. Again, Torres doesn't argue how he was prejudiced – because he has not referred us to those parts of the statement that caused prejudice – but we assume his concern regarded statements he made about his cellphone.

We find no merit in Torres's arguments. The judge found the detective reliable. And, while the detective acknowledged Torres was never explicitly advised of his right to leave, that Torres refused to sign any of the forms, and that he expressed on the second occasion that he did not want to make a "statement," Torres was explicitly advised each time he was not under arrest, Torres indicated his consent to the video recordings even though he refused to sign the forms, and on the second occasion acknowledged he understood his rights. He left freely after both interviews and ended the second himself by stating he no longer wished to talk, a request the detectives immediately honored, and one that would not likely have been made had he sincerely felt coerced. Considered in light of Torres's familiarity with the criminal justice system, and with the benefit of a review of the video recordings, the judge was entitled to conclude from the totality of the circumstances that Torres's statements were voluntary and there was no restraint to his freedom of movement that would have rendered the interviews custodial interrogations in the first place. Though the record was not one-sided, the testimony and evidence the judge found reliable was sufficient to support his findings, which are therefore entitled to deference on appeal. Elders, 192 N.J. at 242-44.

III

All defendants argue the admission of certain out-of-court statements deprived them of their right to confrontation: (a) Lewis and Harris challenge the admission of Torres's statements that were discussed in Section II of this opinion; (b) Harris also takes issue with the admission of a statement Lowery made to a parole officer; and (c) Torres quarrels with the admission of statements Lewis and Bond made to third parties. We find no merit in these arguments.

A

Criminal defendants enjoy coextensive federal and state constitutional rights to confrontation of any witnesses called to testify against them. State v. Roach, 219 N.J. 58, 74 (2014). This constitutional protection, however, excludes only those out-of-court statements that are "testimonial," Crawford v. Washington, 541 U.S. 36, 68 (2004), which, as pertinent here, include at least those statements that are the "product of police interrogation," State v. Cabbell, 207 N.J. 311, 329 (2011). Statements given to police qualify as testimonial if the surrounding "circumstances objectively indicat[e] that . . . the primary purpose of the interrogation is to establish or prove past events potentially

A-2411-15T3

relevant to later criminal prosecution." Davis v. Washington, 547 U.S. 813, 822 (2006). Hearsay that is non-testimonial, on the other hand, may be admitted without running afoul of these constitutional principles to the extent the statements fit a recognized exception to the hearsay rule. State v. Weaver, 219 N.J. 131, 151 (2014).

The Confrontation Clause further demands that, in the context of a joint trial, a non-testifying defendant's confession may not be admitted at trial to the extent it directly incriminates a co-defendant, even if an appropriate limiting instruction is given, unless the statement is redacted to exclude all incriminatory references to the co-defendant. Bruton, 391 U.S. at 126. The same principle, however, does not apply when a defendant's statement is "'not incriminating [to the co-defendant] on its face,'" but "linked to the [co-defendant] only through other evidence." Weaver, 219 N.J. at 153 (quoting Richardson v. Marsh, 481 U.S. 200, 208 (1987)). And a "statement is not facially incriminating merely because it identifies" a co-defendant. United States v. Angwin, 271 F.3d 786, 796 (9th Cir. 2001), overruled in part on other grounds, United States v. Lopez, 484 F.3d 1186 (9th Cir. 2007). The statement "must also have a sufficiently devastating or powerful inculpatory impact" for its admission to run afoul of these constitutional principles. Ibid.

Lewis and Harris take issue with the admission of Torres's statements to police in which he neither confessed to the crime nor implicated either of co-defendant. The critical aspect of the statements in this context was that Torres acknowledged he was the subscriber and primary user of his cell phone. As discussed in Section II, the judge admitted the statements subject to considerable redaction and an appropriate limiting instruction, though the reference to Lewis and Harris as acquaintances remained. Consequently, Lewis and Harris argue the admission of this evidence deprived them of their right to confrontation, emphasizing in particular that the statements were testimonial, they had no opportunity to cross-examine Torres, and the statements named them directly.

Although correct that the statements were testimonial, their admission does not run afoul of Crawford principles because the statements were not admitted against these two defendants, only against Torres. United States v. Harris, 167 Fed. Appx. 856, 859 (2d Cir. 2006). In that connection, the trial judge explicitly instructed the jury that, if it found a particular statement had been made, it could "consider that statement only against the individual who made the statement." Nor did the admission of the statements run afoul of Bruton, because they did not directly incriminate any of the defendants on their face so as to undermine the reliability of the limiting instruction. Weaver, 219

N.J. at 153. That they happened to mention Lewis and Harris by name is of no moment in itself. Angwin, 271 F.3d at 796.

B

Harris challenges the admission of testimony of a representative from the City of Philadelphia Probation Department that Lowery provided his parole officer with the number for his cell phone; other evidence in the record revealed that cell phone had contact with defendants' phones at the time of the crimes. Following a N.J.R.E. 104 hearing, the judge admitted the evidence via the business records exception to the hearsay rule, N.J.R.E. 803(c)(6).

Harris does not challenge admissibility on that ground; he instead argues the record of the phone number incorporated hearsay from both the parole officer and Lowery that was testimonial in nature and should therefore have been excluded. We reject this argument; the statements were not testimonial. The records custodian testified that the phone number was collected and recorded by the parole officer when gathering Lowery's pedigree information and not for the purpose of gathering evidence as part of a criminal investigation. So, the evidence's admission at trial did not violate Crawford principles.

## C

Torres takes issue with the admission of testimony about a statement Bond made to a girlfriend asking whether she had spoken to the police and directing her not to "tell anybody," and statements Lewis made to a girlfriend to convince her to give him a ride the night of the crimes. The judge concluded all this evidence was admissible pursuant to the co-conspirator exception to the hearsay rule, N.J.R.E. 803(b)(5).

Statements made by a co-conspirator are admissible against all conspiracy members via N.J.R.E. 803(b)(5) if the prosecution establishes: "(1) the statement was 'made in furtherance of the conspiracy'; (2) the statement was 'made during the course of the conspiracy'; and (3) there is 'evidence, independent of the hearsay, of the existence of the conspiracy and [the] defendant's relationship to it.'" State v. Cagno, 211 N.J. 488, 530 (2012) (quoting State v. Taccetta, 301 N.J. Super. 227, 251 (App. Div. 1997)). Completion of the criminal act does not preclude a statement made after the act, State v. James, 346 N.J. Super. 441, 458-59 (App. Div. 2002), if the statement serves a "current purpose, such as to promote cohesiveness, provide reassurance to a co-conspirator, or prompt one not a member of the conspiracy to respond in a way that furthers the goals of the conspiracy," Taccetta, 301 N.J. Super. at 253.

Torres argues that Bond's and Lewis's statements do not qualify, noting that they were made after the criminal acts had already been completed, that there was no evidence to suggest the purported conspiracy included Torres when the statements were made, and that the statements were not made in furtherance of a conspiracy. He also claims admission of the statements deprived him of the right of confrontation because he had no opportunity to cross-examine either declarant. We disagree.

It is well-established that admission of evidence through the co-conspirator exception does not transgress the Confrontation Clause. State v. Savage, 172 N.J. 374, 402 (2002). So, the only question is whether the statements satisfied that exception. Viewed in context, there is no question that the statements furthered the conspiracy: in Bond's case to secure a witness's cooperation, and in Lewis's to facilitate transportation. Torres advances no more than a bald assertion to the contrary. And it is appropriate to conclude the statements were made during the course of the conspiracy, notwithstanding the fact that the homicide had already occurred, because they were made to escape detection. Moreover, cell phone location data as well as witness testimony as to the connections between and among defendants and their similar movements to certain locations during certain critical timeframes on the evening in question

30

provided evidence of a conspiracy independent of these statements. It follows that the judge's decision to admit the statements fell well within his discretion. See State v. Prall, 231 N.J. 567, 580 (2018).

IV

Defendants next contend the judge infringed their right to a fair trial by refusing to declare a mistrial after the deliberating jury announced an impasse and, also, by giving the jury what defendants believe was an inappropriately coercive instruction to continue deliberating.

The record reveals that on the fourth day of deliberations the jury sent the judge a note advising that "[a]s of now we are deadlocked and we do not foresee a unanimous decision to be in agreement on any count for any of the three defendants." They asked the judge, "[h]ow would you like us to proceed?" All defendants sought a mistrial but the judge denied those requests in light of the relatively brief time the jurors had deliberated; the judge directed the jury to continue to deliberate, explaining:

> Ladies and gentlemen, we started jury selection in this case on January 6th of this year. We went through 27 days of trial testimony. We had over a month of jury selection. We've called 56 witnesses. You have had the case since May 7th. But over that period of time, you've only had -- excluding lunch periods, excluding periods of time for read back, you've only had the case

for ten or so hours. Given the amount of time, the complexity of the case, I'm not willing to accept that decision at this point in time.

I want you to return to the jury room and continue your deliberations with the following proviso that it is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and to change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of . . . your fellow jurors, or for the mere purpose of returning a verdict. Remember, you are not partisans. You are judges, judges of the facts. And with that proviso, I ask you to return to the jury room and continue your deliberations.

Defendants focused on the judge's comment that he was "not willing to accept" the jury's claim of a deadlock. Defendants raised the issue again when moving for a new trial prior to sentencing.

Defendants argue now that the judge was bound to declare a mistrial, noting that the jury's message was unambiguous about a deadlock and the jury had already reached its fourth day of deliberations. The judge compounded the error, they argue, by expressing within the ordinary supplemental charge his unwillingness to accept a hung jury and by referring to the considerable length

32

of the trial. They contend the jurors would reasonably understand the judge's comments as admonishing that they would abdicate their responsibilities if they failed to reach a verdict, and that the judge would force deliberations to continue indefinitely until a verdict was reached. In short, defendants assert the charge was coercive, undermined the integrity of the verdict, and deprived them of a fair trial. We reject this argument.

To be sure, criminal defendants enjoy both a state and federal constitutional right to trial by a fair and impartial jury, State v. Valenzuela, 136 N.J. 458, 467-68 (1994), at the core of which is the right to a "free and untrammeled verdict," State v. Czachor, 82 N.J. 392, 400 (1980). Because the deliberative process is integral to a jury's fact-finding responsibilities, a judge must ensure its "insulation" from any "influences that could warp or undermine the jury's deliberations and its ultimate determination." State v. Corsaro, 107 N.J. 339, 346 (1987). That includes any influence from the court itself. State v. Shomo, 129 N.J. 248, 257 (1992).

When a jury declares an impasse, a judge should ordinarily "inquire . . . whether further deliberation will likely result in a verdict." Valenzuela, 136 N.J. at 469. If the judge concludes, in light of the "length and complexity of trial and the quality and duration of the jury's deliberations," Czachor, 82 N.J. at 407, that

33                                                    A-2411-15T3

the "difference of opinion between [its] members . . . is clearly intractable," it should declare a mistrial, <u>Valenzuela</u>, 136 N.J. at 469. But, if those circumstances have not been demonstrated, the judge may instruct the jury to continue its deliberations. <u>State v. Ross</u>, 218 N.J. 130, 144-45 (2014). In short, judges are vested with broad discretion in such situations, and appellate courts will intercede only when able to conclude the judge abused that discretion. <u>State v. Paige</u>, 256 N.J. Super. 362, 381 (App. Div. 1992). We are satisfied the judge soundly exercised his discretion. Considering the extraordinary length of time in both selecting a jury and eliciting evidence and testimony from dozens of witnesses, the judge was entitled to deem that ten hours of deliberations were insufficient to conclude, even from the jurors' perception that they were deadlocked, that a mistrial was the only proper course.

Of course, in sending the jury back to further deliberate, a judge's instructions must not be coercive or otherwise improperly influence dissenting jurors to change their votes for the sake of a verdict. <u>State v. Figueroa</u>, 190 N.J. 219, 238 (2007). Errors that "impact substantially and directly on fundamental procedural safeguards, and particularly upon the sensitive process of jury deliberations, are not amenable to harmless error rehabilitation." <u>Czachor</u>, 82 N.J. at 404.

The remarks defendants question were neither inaccurate nor coercive when considered in their context. The judge mentioned the length of time spent on the trial, but only to explain that the time jurors had deliberated was brief by comparison. Nor could the judge's comments be reasonably understood to express an abject unwillingness to ever accept a hung jury, as defendants assert. The judge communicated only an unwillingness to accept that result "at th[at] point in time." And any concern defendants raise that dissenting jurors might have been pressured to surrender honest convictions for the sake of reaching a verdict is belied by the judge's delivery of a slightly modified version of the standard charge, which carefully reminded jurors not to do so.

We conclude the judge did not abuse his discretion either in declining to grant a mistrial or in the manner he instructed the jury to continue deliberations.

V

All defendants argue the judge abused his discretion and deprived them of a fair trial by permitting admission of redacted "gang" photographs featuring Harris and Torres, among others. Torres also contends the admission of references to the gang "B-Block" and to Lowery had the same effect.

Generally, our evidence rules permit the admission of all relevant evidence – evidence having a "tendency in reason to prove or disprove any fact

of consequence to the determination of the action," N.J.R.E. 401 – unless excluded by other rules. State v. Scharf, 225 N.J. 547, 568-69 (2016). The argument here focuses on whether this relevant evidence should have been excluded because "its probative value [was] substantially outweighed by the risk of . . . undue prejudice." N.J.R.E. 403(a). Such a determination rests within a trial judge's broad discretion, State v. Sands, 76 N.J. 127, 144 (1978), and will not be disturbed unless "so wide of the mark that a manifest denial of justice resulted," State v. Cole, 229 N.J. 430, 449, 453 (2017).

Defendants challenge the admission of four group photographs obtained from MySpace that were introduced to establish a familiarity among those identified in the pictures. Lewis does not appear in any of the photographs, but Harris and Torres were among those pictured in the first, second, and fourth; Torres appears in the third, along with Bond's cousin. One bone of contention at trial was the fact that in the first three photographs, several pictured individuals were making middle-finger gestures – Harris made that gesture in the second photograph – and others were making different hand gestures of unidentified significance in the second and third. One person in the first photograph had a red bandanna hanging out of his pocket, while someone in the

third had a bandanna of the same color tied around his wrist. The fourth photograph included none of these elements.

Defendants objected to admission of all of the photographs, requesting a redaction that would remove the bandannas, hand gestures, and any individuals aside from those involved in this case so the jury would not speculate that defendants or those with whom they associated were gang members. The State agreed to eliminate the bandannas, but the judge admitted the exhibit with no further redaction, reasoning that none of the hand gestures was suggestive of gang affiliation absent expert testimony to that effect, and reasoning further that the photographs were not otherwise so prejudicial as to warrant exclusion. Torres complains about another set of group photographs, also obtained from MySpace and introduced for the same purpose. These photos were similarly redacted.

Defendants contend that, even in redacted form, the photographs suggested defendants were Bloods members or, at best, associated with members of the Bloods, and assert that this undue prejudice clearly outweighed the photographs' limited probative value. Lewis acknowledges he was not in any of the photographs, but nonetheless believes the evidence tarnished his defense through "guilt by association." Lewis and Harris add that, because of the gang-

affiliation prejudice that they believe accompanied these photographs, their admission should have been evaluated pursuant to N.J.R.E. 404(b), which limits the prosecution's use of other-crimes evidence.

We agree evidence of gang membership must be evaluated through a N.J.R.E. 404(b) analysis. See State v. Cofield, 127 N.J. 328, 338 (1992); State v. Goodman, 415 N.J. Super. 210, 227-28 (App. Div. 2010). But that argument was never asserted at trial and the photographs were never introduced to show gang affiliation. Moreover, they were redacted specifically to remove the red bandannas and a sign mentioning "B-Block," the only obvious indicia of that affiliation, as well as the hand gestures mimicking holding a gun and the picture on the t-shirt, the only portions obviously suggestive of violence.

That is not to say that the redacted photographs are otherwise sterile. Many of them, for example, depicted individuals giving an obscene gesture, but that gesture is ubiquitous and not unique to gang members. None of the other unredacted hand gestures had their significance explained by any expert at trial, so there was no reason to believe a juror would draw an inference that the individuals depicted were gang members. Defendants have not shown that the

judge's rulings were so wide of the mark as to justify reversal.  <u>Cole</u>, 229 N.J. at 453.[3]

VI

Defendants next argue the evidence was insufficient to sustain their convictions.  Lewis and Harris specifically contend they were entitled to a judgment of acquittal because the record was inadequate to establish proof of their guilt beyond a reasonable doubt, particularly when – as they have argued here – numerous errors were committed.  Harris and Torres argue that they should at least have been granted a new trial for this reason.

On a <u>Rule</u> 3:18-1 motion for judgment of acquittal, a trial judge must determine "'whether, viewing the State's evidence in its entirety . . . and giving the State the benefit of all its favorable testimony as well as all of the favorable

---

[3] To the extent Torres asserts that references to "B-Block" and Lowery were clearly prejudicial and irrelevant, he is only half-correct and only as to the first respect because the judge ordered that "B-Block" be redacted at every mention from Torres's statement.  And, although all required redactions were made to the transcript, only one single mention was inadvertently left in the video recording played to the jury.  That reference was fleeting and there was no testimony in the record that would explain to the jury what the term meant, so we conclude no prejudice could result from it.  The judge was well within his discretion in denying Torres's motion for a mistrial.  As to the other part of Torres's argument, references to Lowery were clearly relevant because Lowery was the subscriber of the phone that Bond used on the night of the crimes and with which Lewis had contact.

39

inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt . . . beyond a reasonable doubt.'" State v. Wilder, 193 N.J. 398, 406 (2008) (quoting State v. Reyes, 50 N.J. 454, 459 (1967)).  We apply the same standard when reviewing the disposition of such a motion.  State v. Josephs, 174 N.J. 44, 81 (2002).

When Rule 3:20-1 is invoked, a judge may grant a new trial "in the interest of justice" but must not "set aside the verdict of the jury as against the weight of the evidence unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law."  A judge's decision on such an application is discretionary and entitled to great deference.  State v. Brooks, 366 N.J. Super. 447, 454 (App. Div. 2004).  So, even though essentially the same standard – whether there was a manifest denial of justice – is applied on appeal, the reviewing court must "weigh[] heavily" the judge's "views of credibility of witnesses, their demeanor, and [the judge's] general 'feel of the case.'"  State v. Sims, 65 N.J. 359, 373 (1974); accord State v. Brown, 118 N.J. 595, 604 (1990).

Defendants argue the judge erred in denying their motions at the close of the prosecution's case and later, after the verdict but before sentencing, because,

in their view, the record was simply insufficient to support their convictions. They emphasize that all of the evidence was circumstantial and that the bulk of it was simply data, which, at best, inexactly established their locations at certain times. There were, they argue, no witnesses, no physical evidence, and no other direct evidence to establish either their intentional participation in these crimes or their precise roles or involvement. Indeed, Harris asserts that even the State's evidence confirms he was not in the car when Worthy was brought to Green Brook. He and Torres also contend that if a judgment of acquittal was unwarranted they should nonetheless have been given a new trial.

We reject these arguments. The significance of CSLI to this case was not that it ambiguously placed defendants at approximate locations at any one particular time, but that it demonstrated the unusual coincidence of their locations and directions of travel throughout the extended period during which this sequence of crimes occurred and during which call records revealed they remained in contact with one another. Harris and Lewis remained in frequent contact throughout, and Lewis and Torres were both in contact with Bond just before the kidnapping. CSLI then showed that all three converged in the vicinity of Bond's home at the same time Worthy was there, and that the two sets of cohorts separately made their way west toward Green Brook and then suddenly

east back toward Newark after Jackson encountered the masked individual in Worthy's car. Though Harris and Torres failed to reach Green Brook by that time, a cell cite across the highway from Jackson's home placed Lewis there right in time for the encounter.

Harris is correct that the evidence showed he was not in the car with Worthy when she was driven to Green Brook. But he ignores that CSLI revealed he was proceeding in the same direction from the same starting point near Bond's home, that he abruptly changed directions at the time Jackson's neighbor called the police, and that he ended up in Elizabeth where Worthy's body was later found. The same can be said for Torres, whose phone followed the same approximate path. And so did that of Bond, whose gift of Worthy's handbag to Campbell ultimately steered the criminal investigation in defendants' direction.

Harris asserts in his pro se brief that the State failed to establish even that he was the user of the phone attributed to him because evidence showed several calls from that phone were likely placed by Bond. But Billups testified that he communicated with both Harris and Bond on that phone, and Rose, the subscriber on that phone's account, unequivocally testified that Harris was the phone's user when the crimes occurred. Lastly, insofar as Harris points out that Campbell never identified him as one of the individuals with Bond when she

lent Bond her car, and that Scott never identified him as one of those she picked up with Lewis later that night, neither fact, even taken at face value, undermines the evidence we have already summarized to a degree that would call into question the integrity of the jury's verdict.

In short, the evidence may have been circumstantial and perhaps not overwhelming, but the evidence was sufficient to permit a rational juror to find guilt as to each defendant beyond a reasonable doubt. The judge, therefore, did not err in denying the motions for judgment of acquittal or for a new trial.

VII

Lewis and Torres next contend they were deprived of a fair trial as a consequence of the purported online dissemination of a photograph of Harris and Torres at trial in handcuffs.

Integral to a criminal defendant's constitutional right to trial by an impartial jury is the requirement "that the jury's verdict be based on evidence received in open court, not from outside sources." Sheppard v. Maxwell, 384 U.S. 333, 351 (1966). When prejudicial mid-trial publicity "threatens the fairness and integrity of a defendant's trial," the "procedure of questioning an

impaneled jury . . . should not be invoked begrudgingly." State v. Bey, 112 N.J. 45, 89 (1988).

When ascertaining whether voir dire is appropriate, a judge must "examine the information disseminated to determine if it has the capacity to prejudice the defendant," and, if so, the judge must then consider whether "there is a realistic possibility that such information may have reached one or more of the jurors" in light of the "extent, notoriety, and prominence" of the publicity. Id. at 84, 86. Our courts have long recognized that prejudice may result from a defendant's appearance before a jury in restraints, State v. Artwell, 177 N.J. 526, 534 (2003), so it follows that a photograph seen by jurors depicting that circumstance may likewise cause prejudice.

At least as far as is evident from the record, the photograph at issue here was discussed and the issue resolved entirely in the course of the following brief exchange approximately halfway through the lengthy trial:

> THE COURT: All right. Counsel, before we started the proceedings today, Mr. Hinrichs brought to my attention an issue that may have occurred yesterday in court. He represented that his client's mother advised him that S[hy]eisa Robichaw had placed on her Instagram account a photograph of Mr. Harris and Mr. Torres being taken from court, outside the presence of the jury at the close of the day, in handcuffs. And that Instagram account picture had been taken and placed on

44

various other Instagram accounts, and it is proliferating in the Internet as we speak.

MR. HINRICHS [Counsel for Torres]: That's my understanding. I did not see it personally, but that's what I was told.

THE COURT: Mr. Liguori, you'd like to be heard?

MR. LIGUORI [Counsel for Harris]: Well, Judge, I'm concerned about that my client is going to be seen and possibly be seen by these jurors. I don't know if they frequent Instagram, and I have no idea how Instagram works frankly. But I think what might be appropriate is some re-instruction to the jury that, you know, throughout the course of the trial, they should not consult social media, they should not, you know -- the instruction you've already given about that maybe should be regiven at this time.

THE COURT: All right. That's the instruction given at the first break. I'll do it again at the conclusion of the case, but I will also give it to them now.

As promised, when the jurors returned to the courtroom, the judge reminded them not to:

> talk about this case among yourselves, don't listen to anyone else. That's my standard instruction. . . . But I also wanted to let you know that you're not to read or have anyone read to you any newspaper accounts or search the Internet for any media accounts about this trial or have anyone read to you or search the Internet for any blogs, tweets, Face Book pages, Instagram. What other social media things do I use to spy on my son? Face Book, Instagram, Pinterest. Don't go on the Internet and look for anything about this case or anyone

A-2411-15T3

connected to this case. And that's just a continuing instruction that we have.

Both Lewis and Torres now argue that the judge had an obligation to question the jurors as to their knowledge of the purported photograph and, if seen by a juror, grant a mistrial. They assert that the judge's failure to take that step deprived them of a fair trial, reasoning that, in the context of this heavily circumstantial case, any prejudice from the photograph would have undermined their rights to an impartial jury and negated the presumption of innocence.

We find no merit in this argument. The photograph's existence and what it depicted, if it did exist, were conjecture and a matter of hearsay. Torres's counsel admitted he had not seen the photograph and only learned of it from his client's mother, who had apparently found it on the social media account of a witness that none of the ultimately impaneled jurors acknowledged having known during voir dire. Counsel represented he was told that the photograph had proliferated beyond that account, but without specifying the extent – and defendants having never presented a copy of the photograph either in the trial court or on appeal so that it could be subject to evaluation for any actual prejudice – the claim of prejudice in failing to voir dire jurors about the photograph is without merit.

A-2411-15T3

We would also add that Lewis fails to explain how the proliferation of such a photograph could have prejudiced him, let alone "completely obliterated" his right to a fair trial, if he was not depicted. His arguments on appeal suggest he was depicted, but, if that was the case, it was never brought to the attention of the trial judge. Moreover, neither his counsel nor Torres's ever requested that the jury be subjected to voir dire as to their knowledge of the photograph. It was Harris's counsel who suggested that the jury merely be reminded of its obligation not to consult social media during the trial, and the other defendants' attorneys acquiesced.

Arguably, the invited error doctrine might have application here, see State v. Corsaro, 107 N.J. 339, 345 (1987), but we see no error at all. A decision whether or in what manner to conduct voir dire in such a circumstance is subject to review on appeal only for an abuse of discretion. State v. R.D., 169 N.J. 551, 559-60 (2001). The judge did not abuse his discretion in declining to unilaterally conduct a voir dire of jurors as to whether they saw on social media a photograph whose existence was speculative, notwithstanding that they had already been instructed not to visit social media at all and should be presumed to have followed that instruction. State v. Loftin, 146 N.J. 295, 390 (1996).

VIII

Harris argues that the judge erred in failing to grant a mistrial to remedy the prosecutor's failure to timely disclose a statement that Rose, Harris's cousin, gave to police.

In the interest of guaranteeing fair and just trials and promoting the search for truth, our court rules generally provide criminal defendants with broad pre-trial discovery. State v. Scoles, 214 N.J. 236, 251-52 (2013). They entitle an accused to the automatic discovery of any evidence the State gathers to support its charges, id. at 252, and require that the State promptly furnish copies or permit inspection of any such evidence, particularly if it is exculpatory, R. 3:13-3(a)(2), (b)(1). The State has an obligation – beyond the rules themselves – to disclose any evidence that is material and favorable to the defense pursuant to Brady, 373 U.S. at 87, as a matter of due process.

To establish a violation of that obligation, a defendant must demonstrate that "(1) the prosecutor failed to disclose . . . evidence, (2) the evidence was of a favorable character to the defendant, and (3) the evidence was material" to the outcome of the case. State v. Parsons, 341 N.J. Super. 448, 454 (App. Div. 2001). Evidence that is not directly exculpatory in itself but that has value for impeachment purposes satisfies the standard. State v. Nash, 212 N.J. 518, 544

48

(2013). Moreover, where "no request is made by the defendant or only a general request is made, information not revealed by the prosecutor will be considered material only if 'the omitted evidence creates a reasonable doubt that did not otherwise exist. . . .'" State v. Carter, 91 N.J. 86, 112 (1982) (quoting United States v. Agurs, 427 U.S. 97, 112 (1976)).

A judge's determination whether evidence is subject to disclosure under Brady presents a mixed question of law and fact. State v. Marshall, 148 N.J. 89, 185 (1997). A judge's legal conclusions will be subject to de novo review, while underlying findings of fact will be disturbed only if clearly erroneous. United States v. Pelullo, 14 F.3d 881, 886 (3d Cir. 1994).

The evidence at issue here is a statement that Rose gave to the prosecution on March 6, 2015, just after the trial began and a week before her anticipated testimony. Harris was not immediately advised and did not learn of the statement until Rose's direct examination on March 12, 2015, after she testified that she had lent her phone to "quite a few" other individuals in addition to defendant and could not recall the precise time frames she did so. The State's attempt to confront her with the transcript of a contrary statement she gave to police on April 29, 2009, prompted the following exchange:

> Q. Have you ever talked to the police regarding your cellphone?

A. Uh, to my recollection, I don't know what I talked to police about. <u>I told you in 2008 I used to be under the influence at all times.</u>

Q. On April 29, 2009, did you talk to a police investigator regarding your cellphone?

A. You all said I did. I don't know. I don't remember.

Q. Have you had an opportunity to review a transcript of --

A. <u>Like I said to you . . . and I'm saying it again, that transcript is a bunch of crap.</u> In 2008, I can't remember two weeks ago. How I'm supposed to remember 2008?

[(Emphasis added).]

Because Rose suggested she had spoken to the prosecution about her condition and the quality of the transcript of the April 2009 interview outside the context of any statement already disclosed to the defense, Harris's counsel immediately objected and moved for a mistrial on <u>Brady</u> grounds.

An assistant prosecutor acknowledged that Rose said just before proceedings began that day that she did not want to testify, that the transcript was a "piece of crap," and that she was under the influence at the time of the interview. The judge excused the jury and held a hearing during which Rose confirmed she made those remarks earlier that day. She further testified that she made the same remarks, at least with respect to the quality of the transcript and

50

her being under the influence, to another assistant prosecutor and a detective on March 6, 2015, the first time she was shown the transcript.

The detective Rose identified, however, testified at the hearing that Rose left after the assistant prosecutor reviewed the transcript of her statement with her and could not recall her mentioning anything about being intoxicated when she gave the statement. Another detective present at the same meeting recalled hearing Rose say, "this is bullshit, I have no involvement, I'm not a witness to anything"; he could not recall her mention anything about being under the influence.

To the extent Rose's recollection of events contrasted with that of the two detectives, the judge credited the detectives' versions and found, based on their testimony and the assistant prosecutor's consistent representations, that Rose had at most told them she was reluctant to testify. That did not, the judge concluded, constitute evidence covered by Brady and so did not warrant a mistrial. Nonetheless, given that the issue of Rose's possible substance abuse came to light, and believing it was relevant to her credibility, the judge ordered that Rose be excused for the time being. She was not called to testify for at least two weeks to allow time for investigation of the matter. Rose was recalled to the stand on April 1, 2015, at which point Harris's counsel exercised his

opportunity to cross-examine her as to whether she had been under the influence when she gave the statement, and she testified that she had been.

Harris maintains on appeal that he was entitled to a mistrial, asserting that the claimed violation infringed his right to disclosure and, as a consequence, his right to a fair trial. He points out that the prosecutor conceded failing to disclose Rose's statement and Rose, who could have been impeached with the statement, was crucial to the State's circumstantial case against him. But, even taking Rose's version of events as to what she said at the March 6, 2015, meeting at face value – and the judge, as was his prerogative, did not view it that way – that left an opportunity for disclosure prior to her testimony. The State, of course, disclosed nothing within that window, but, even if it had been bound to do so pursuant to Brady, the information at issue was nonetheless brought to light in a timely enough fashion to eliminate any harm from the State's failure in that regard. See United States v. Higgs, 713 F.2d 39, 43-44 (3d Cir. 1983) (recognizing, in similar circumstances, that "[n]o denial of due process occurs" so long as such "material is disclosed . . . in time for its effective use at trial").

Rose's purported statement came to light early in her initial direct examination, and defendants were given more than two weeks to investigate the most pertinent credibility-related evidence therein prior to conducting cross-

examination. Even if there was anything to the statement that was subject to mandatory earlier disclosure under Brady, Harris could have suffered no harm from the State's failure to disclose it, because he learned the information in time to "effectively use" it for impeachment purposes at trial. Ibid.

IX

We also reject the arguments of Lewis and Harris that comments the prosecutor made during summation were not reasonably supported by the record, misled the jury as to the facts at issue, and thereby deprived them of a fair trial.

A prosecutor is "charged not simply with the task of securing victory for the State but, more fundamentally, with seeing that justice is served." State v. Reddish, 181 N.J. 553, 641 (2004). Although "afforded considerable leeway" during summation, "a prosecutor must refrain from improper methods that result in wrongful conviction." State v. Smith, 167 N.J. 158, 177 (2001). In particular, prosecutors must confine their comments to "evidence revealed during the trial and reasonable inferences to be drawn from that evidence." Id. at 178.

Yet "'not every deviation from the legal prescriptions governing prosecutorial conduct' requires reversal." State v. Jackson, 211 N.J. 394, 408-09 (2012) (quoting State v. Williams, 113 N.J. 393, 452 (1988)). A reviewing

court evaluates challenged remarks not in isolation but in the context of the summation as a whole. State v. Atwater, 400 N.J. Super. 319, 335 (App. Div. 2008) (citing Carter, 91 N.J. at 105). Reversal is warranted only when the remarks are "clearly and unmistakably improper" and when the remarks "substantially prejudice" the accused's right to a fair evaluation of the evidence. State v. Harris, 181 N.J. 391, 495 (2004); see also State v. Ingram, 196 N.J. 23, 42 (2008). In evaluating the remarks, a reviewing court should consider "(1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." Smith, 167 N.J. at 182.

In their appeals, Lewis and Harris complain of the prosecutor's following remarks about the significance of the numbers in cell phone records showing calls between the phones attributed to the two:

> Interesting thing about the Robert Harris calls . . . .
>
> [T]hat 1 (267) in front of the numbers in the Sprint records show that that's a call that you have in your contacts. That call is saved in your contacts. So all those obsessive calls, those 20 consecutive calls from Mr. Lewis' telephone, those are all calls to someone who he's close enough to have in his contacts. That's one of his personal contacts.

54

Alluding to other remarks the prosecutor already made about calls from the same phone to Lewis's fiancé and other friends and relatives, the prosecutor argued that this coincidence of contacts revealed that Lewis was the individual who had used the phone when the crimes were committed.

Harris and Lewis both objected, asserting that Harris was not listed in Lewis's contacts and that there had been no testimony about the significance of the prefixes in the call records that would suggest otherwise. The prosecutor responded that he remembered testimony from a T-Mobile representative to precisely that effect, and though the judge did not share that recollection, he concluded that, if on review of the record, no such testimony could be found, he would entertain a motion to strike the challenged remarks before the jury began deliberations. In the interim, the judge reminded the jury that, "with respect to the prosecutor's comments regarding the dialed digit and 1 followed by 267, [whether] that indicates that is a number that is in someone's contacts, you'll have to rely on your recollection of the evidence as to what was testified in that regard."

Lewis's counsel again brought the matter to the judge's attention during a sidebar on a different objection, asserting that a Sprint representative had testified in Bond's trial that the significance of the introductory numeral "1" was

likely that it was pressed when dialing long distance from a landline. But the judge noted that the prosecutor had cited testimony from a different witness, and again assured counsel that the testimony would be reviewed for the accuracy of the prosecutor's earlier remarks.

The stenographer searched the record at the judge's request during a break and found the following testimony, albeit from a different witness than the prosecutor recalled, as to the significance of the number:

> It means that there was a 1 that was dialed prior to the area code, when it was dialed, or it also means that on Sprint phones when you put in a number into your contact list or a speed dial list, it often puts a 1 in.

The prosecutor assured the trial judge that he would clarify his remarks to reflect that testimony and promptly told the jury:

> Just to clear up any issues regarding when I talked about the Sprint telephones and talking to the custodian of records and saying when there was a 1 in front of the area code, as in 1(267) in the dialed digits columns, what I believe the Sprint custodian said -- I asked him, what does that mean. He says, there was a 1 dialed, or in a Sprint phone, if you add a name to -- or number to your contact list or you add a name to your speed dial list, the phone automatically puts that 1 in.
>
> So I made the inference that that number 1 was added from a contact list or a speed dial list that the person with the phone would have had to enter.

Lewis's counsel interjected – claiming the prosecutor's statement was inaccurate – and the judge again reminded the jurors that their own recollection of the testimony would prevail. Lewis's and Harris's counsel brought the matter up again when the prosecutor ended his summation, arguing the remarks remained misleading, but the judge overruled their objection because the prosecutor's clarification had been a "fair comment based on the testimony."

For his part, Harris also takes issue with the prosecutor's mention, in the course of the following argument in summation, that a particular phone call occurred between Harris and Shyiesha Robichaw:

> So, how about the defendants in this case? Well, Lewis, at 6:35, is hitting off a cell tower at 460 Main Avenue [in Lodi]. . . . Mr. Harris, who is from Philadelphia, Pennsylvania, is communicating with Shyiesha Robichaw, another person that you heard. She was having a dating relationship. You heard from her. She came into court. And at 6:32 p.m., Mr. Harris' phone is hitting off of 460 [M]ain Avenue in Lodi. Sharif Torres, another person from Philadelphia, at 6:21 p.m. is hitting off a cell tower at 460 Main Avenue in Wallington, near Lodi. The inference that you can draw from those facts is that the three of them were together and that they were up near Jamel Lewis' house, dropping off Jamel's car in a parking complex before traveling to Newark.
>
> [(Emphasis added).]

Harris's counsel did not immediately object, but later brought the issue up during a sidebar regarding the other challenged remarks addressed above. He pointed out that the call made at 6:32 p.m. had not actually been to Robichaw's number and asked that the prosecutor's contrary comment be corrected. The judge promptly reminded the jury that its recollection of the evidence would control, but no correction was made, and the State now concedes the remark was inaccurate.

Lewis and Harris maintain on appeal that the prosecutor's initial remarks about the contact list were inaccurate or misleading. Though they acknowledge that he eventually offered a clarification, they assert that the damage had already been done, noting that even the judge expressed displeasure with the prosecutor's conduct during summation when the issue was brought up on defendants' motions for a new trial. Harris adds that the prosecutor's erroneous reference to the call with Robichaw likewise unfairly prejudiced him and deprived him of a fair trial.

To the extent the prosecutor's initial remarks could be deemed misleading, simply because he did not specify that he had drawn an inference from particular testimony, he later was more explicit about that claimed inference. At each turn, the judge reiterated that the jurors' own recollection of the evidence would

control, and we adhere to the principle that jurors are presumed to follow a judge's instructions.  Loftin, 146 N.J. at 390.  To be sure, as Lewis and Harris point out, the judge did ultimately express some displeasure with the prosecutor's delay in clarifying his remarks, but not without appropriately acknowledging that those remarks entailed a reasonable inference from the evidence that he was entitled to argue in summation.

The prosecutor's reference to the call between Harris and Robichaw, on the other hand, was undisputedly inaccurate.  Ideally, it would have been stricken from the record or at least, as Harris's counsel requested, corrected for the jury.  But we view the mistake as harmless when considered in context.  Records otherwise showed contact between the phones attributed to Harris and Robichaw, along with those of other of his acquaintances, tending to show his use of the phone during the appropriate time period.  The only significance of the 6:32 p.m. call to the prosecutor's argument was that it demonstrated Harris's location near Lodi when Lewis and Torres were there.  Whether the contact was with Robichaw or not was superfluous to that argument.

In short, the prosecutor's comment about Harris being included in Lewis's phone contacts, once clarified, was neither inaccurate nor misleading, and his

remark as to the phone call between Harris and Robichaw, while inaccurate, was not harmful.

X

Harris argues in his pro se supplemental brief that the instructions to the jury inappropriately suggested that he, rather than the State, was saddled with the burden of persuasion on accomplice liability.

Central to the constitutional guarantee of a fair criminal trial is the judge's "obligation to insure that the jury's impartial deliberations are based solely on the evidence and are made in accordance with proper and adequate instructions." State v. Purnell, 126 N.J. 518, 531 (1992). Instructions should serve as a "road map to guide the jury" in its deliberations, State v. Martin, 119 N.J. 2, 15 (1990), and provide an accurate and "comprehensible explanation of the questions that [it] must determine, including the law of the case applicable to the facts that [it] may find," State v. Green, 86 N.J. 281, 287-88 (1981). Although inaccurate instructions are generally viewed as "poor candidates for rehabilitation" and are "ordinarily presumed to be reversible error," State v. Afanador, 151 N.J. 41, 54 (1997), our Supreme Court has recognized that not every inaccuracy warrants reversal, State v. Jordan, 147 N.J. 409, 422 (1997). In the absence, as here, of any timely objection to an instruction, a reviewing court will reverse only for

60

plain error.  Afanador, 151 N.J. at 54.  That is, reversal will occur only when the error, considered in the context of the charge as a whole, "prejudicially affect[s] the substantial rights of the defendant sufficiently grievous[ly] to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."  Jordan, 147 N.J. at 422 (quoting State v. Hock, 54 N.J. 526, 538 (1969)).

As to accomplice liability, the judge utilized the precise language of the model charge, Model Jury Charges (Criminal), "Liability for Another's Conduct (N.J.S.A. 2C:2-6)" (rev. May 22, 1995), in explaining that accomplice liability could be proven by circumstantial evidence:

> Mere presence at or near the scene does not make one a participant in the crime, nor does the failure of a spectator to interfere make him a participant in the crime.  It is, however, a circumstance to be considered with the other evidence in determining whether he was present as an accomplice.  Presence is not in itself conclusive evidence of that fact.  Whether presence has any probative value depends upon the total circumstances.  To constitute guilt there must exist a community of purpose and actual participation in the crime committed.
>
> While mere presence at the scene of the perpetration of a crime does not render a person a participant in it, proof that one is present at the scene of the commission of the crime, without disapproving or opposing it, is evidence from which, in connection with other circumstances, it is possible for the jury to infer that he

A-2411-15T3

> assented thereto, lent to it his countenance and approval and was thereby aiding the same. It depends upon the totality of the circumstances as those circumstances appear from the evidence.
>
> [(Emphasis added).]

Harris seizes on the highlighted language and contends it implies that, once the prosecution established his presence at the scene, the jury could infer his participation from that lone fact unless he affirmatively demonstrated that he disapproved of or opposed the crime, an impossibility in a case where he denied being present. Harris argues, relying on Moore v. Ponte, 186 F.3d 26, 33-34 (1st Cir. 1999), and Gilbert v. Moore, 134 F.3d 642, 647 (4th Cir. 1998), that the instruction thereby inappropriately shifted the burden of persuasion, and he asserts that this mistake constituted plain error in the context of a circumstantial case that turned nearly entirely on proof of his whereabouts while the crimes were committed.

We initially note that the instructions in the federal cases on which Harris relies were held not to justify reversal, even though the prosecution conceded in both cases the instructions were unconstitutional. Moore, 186 F.3d at 33-34; Gilbert, 134 F.3d at 647, 652. The concern in both those cases was that the instructions created a mandatory presumption, that is, that the instruction could be understood by jurors as requiring them to infer an element of a charged

offense from a basic fact in evidence. Moore, 186 F.3d at 33-34; Gilbert, 134 F.3d at 647. The constitutional infirmity is that such an instruction relieves the prosecution of its burden to prove every element of the offense beyond a reasonable doubt by shifting the burden of persuasion to the accused to rebut the presumed fact. Sandstrom v. Montana, 442 U.S. 510, 524 (1979).

The challenged instruction here, however, cannot reasonably be construed to create such a presumption. The model charge, to which the judge adhered, merely explains that evidence of a defendant's presence at the crime scene, considered along with the surrounding circumstances, could "possibl[y]" give rise to an inference that the defendant participated in commission of the crime. The instruction makes clear that a person's "mere presence . . . does not render [the defendant] a participant," and that whether the inference should be drawn must depend on the "totality of the circumstances."

Confronted with evidence supporting such an inference, a defendant certainly retains the option to present evidence either tending to show disapproval or opposition to the crime notwithstanding the defendant's presence at the scene, or rebutting that the defendant was even present at the scene in the first place. But nothing in the instruction suggests a defendant has any burden to do either of those things or otherwise undermines the defendant's right to

simply put the prosecution to its proofs, <u>In re Winship</u>, 397 U.S. 358, 364 (1970); <u>State v. Parsons</u>, 341 N.J. Super. 448, 457 (App. Div. 2001), which Harris exercised here.  The jury simply did not reach the conclusion he urged.

XI

Harris and Torres argue the cumulative effect of the alleged errors justified a judgment of acquittal or new trial and warrant reversal now.  To be sure, reversal may be justified when the cumulative effect of a series of errors is harmful, even if each is harmless in itself.  <u>State v. Jenewicz</u>, 193 N.J. 440, 473 (2008).  But, as we have already explained, defendants' arguments lack merit, so the premise for this argument hasn't been established.

XII

All defendants contend their sentences were excessive.

Trial judges possess considerable discretion when sentencing defendants. <u>State v. Dalziel</u>, 182 N.J. 494, 500 (2005).  A judge's decision will not be disturbed so long as it follows the applicable statutory guidelines, identifies and weighs all applicable aggravating and mitigating factors, and finds the support of sufficient credible evidence in the record.  <u>State v. Natale</u>, 184 N.J. 458, 489

64

(2005). Beyond that, a sentence will be reversed only if it "shocks the judicial conscience." State v. O'Donnell, 117 N.J. 210, 215-16 (1989).

When sentencing Lewis, the judge found as aggravating factors the nature and circumstances of the offense, N.J.S.A. 2C:44-1(a)(1), and the gravity and seriousness of the harm to the victim, N.J.S.A. 2C:44-1(a)(2). The judge recognized that finding both may at times constitute double counting on a charge of felony murder, but he believed the length of time Worthy "suffer[ed] at [his] hands" justified applying both factors. The judge additionally found as aggravating factors the risk of reoffense, N.J.S.A. 2C:44-1(a)(3), Lewis's extensive criminal record, N.J.S.A. 2C:44-1(a)(6), and the need for deterrence, N.J.S.A. 2C:44-1(a)(9), explaining that Lewis's criminal history was "atrocious."[4] The judge concluded that these aggravating factors clearly outweighed the mitigating factors because he, in fact, found no applicable mitigating factor.

The judge sentenced Lewis to a term of life imprisonment with a mandatory minimum of thirty years on the felony murder conviction. He merged the robbery conviction with the felony murder conviction and sentenced Lewis

---

[4] Lewis had convictions for six indictable offenses, a municipal ordinance violation, a disorderly person offense, ten juvenile adjudications, and a juvenile probation violation.

to a concurrent thirty-year term on the kidnapping conviction, as well as lesser concurrent terms on the remaining convictions.

In sentencing Harris and Torres, the judge found all the same aggravating factors, except the sixth, and again concluded those factors clearly outweighed the mitigating factors, of which he found none. Both Harris and Torres were sentenced to sixty-year prison terms, with mandatory minimums of thirty years, on the felony murder conviction, and lesser concurrent terms – after merging the Worthy robbery conviction into the felony murder conviction – on the remaining convictions.

Lewis argues on appeal that the judge's finding of the first and second aggravating factors double counted not only each other but the elements of the offenses as well. He also claimed the judge should not have given much weight to the third, sixth, and ninth factors, all of which, he believes, are interrelated and arguably apply to any criminal case. Lewis is certainly incorrect in the last respect; indeed, if that were so, the judge would have found, but did not find, the sixth aggravating factor when sentencing Harris and Torres. Insofar as Lewis contends that none of the aggravating factors should have been weighed heavily, it remains that the judge correctly found no competing mitigating factors and Lewis suggests none now. Moreover, although he is correct that the

facts establishing the elements of an offense must not be counted as aggravating circumstances, State v. Kromphold, 162 N.J. 345, 353 (2000), the judge specified that the first two aggravating factors were supported by the considerable length of time Worthy was subjected to harm by these defendants, a circumstance that is not an element of the offense.

Harris, for his part, raises the same double counting argument as to the first two aggravating factors. But he and Torres also quarrel with the judge's finding of those factors on the ground that the evidence failed to reveal the roles they played in these offenses. Harris reasons in particular that the jury's acquittal of him on both weapons offenses leaves no evidence that he personally committed any of the acts on which the first two aggravating factors could be based; he relies on State v. Rogers, 236 N.J. Super. 378, 387 (App. Div. 1989), aff'd, 124 N.J. 113 (1991), for that proposition. Torres adds that, given the weakness of the evidence establishing his participation in these offenses, the lack of any evidence as to his particular role in them, and his relatively young age – twenty at the time of his arrest – the minimum sentence of thirty years would have been sufficient punishment.

To be sure, those contentions are arguable but the judge considered them; the only question is whether the judge's conclusions as to what constituted

proper and just prison sentences for these defendants fell within his discretion. Dalziel, 182 N.J. at 500. In that connection, it is certainly the case that the jury acquitted both Harris and Torres of the weapons charges and it is also true that the evidence failed to show the precise role each played throughout this series of criminal transactions. But it does not inexorably follow that the basis for finding either of the first two aggravating factors here was not personal to each defendant.

At issue in Rogers, 236 N.J. Super. at 387, were aggravating factors based on the circumstances that two of the victims were police officers and one walked with a limp and was therefore particularly vulnerable. We held there that the sentencing judge's findings in those regards were inappropriate because there was no evidence that the defendant actually knew of any of those circumstances. Ibid. We explained that, "[a]lthough a defendant may be vicariously accountable for the crimes his accomplice commits, he is not vicariously accountable for aggravating factors that are not personal to him." Ibid.

In contrast, the judge specified that the basis for his finding of the first two aggravating factors was the sheer length of time Worthy was subject to harm. The jury's conclusion that Harris and Lewis both participated in the series of offenses resulting in her harm for that length of time, based on evidence

tending to show that each participated throughout, sufficed to support the aggravating factors found here, regardless of their precise individual roles or whether either of them personally used a weapon.

We are satisfied that the sentences imposed on all three defendants were within the judge's discretion and that defendants' arguments to the contrary are without merit.

* * *

To the extent we have not discussed any other issue raised in the parties' extensive submissions, it is because we find them to have insufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION