788 A.2d 334 (2002)
STATE of New Jersey, Plaintiff-Respondent,
v.
Khalif O. JAMES, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued October 29, 2001.
Decided January 16, 2002.
*336 Cecelia Urban, Assistant Deputy Public Defender, argued the cause for appellant (Peter A. Garcia, Acting Public Defender, attorney; Ms. Urban, of counsel and on the brief).
Appellant filed a pro se supplemental brief.
Steven J. Kaklowitz, Assistant Prosecutor, argued the cause for respondent (Thomas V. Manahan, Union County Prosecutor, attorney; Patricia L. Cronin, Legal Analyst, on the brief).
Before Judges PETRELLA, KESTIN, and STEINBERG.
*335 The opinion of the court was delivered by STEINBERG, J.A.D.
A Union County grand jury returned Indictment No. 97-7-733, charging defendant Khalif James as follows: first-degree murder, N.J.S.A. 2C:11-3(a)(1), (2) (count two); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3) (count four); first-degree robbery, N.J.S.A. 2C:15-1 (count five); second-degree possession of a certain weapon, a Colt .38 caliber handgun, with a purpose to use it unlawfully against the *337 person of another, N.J.S.A. 2C:39-4(a) (count six); second-degree possession of a certain weapon, a Smith & Wesson .38 caliber handgun, with a purpose to use it unlawfully against the person of another, N.J.S.A. 2C:39-4(a) (count seven); unlawful possession of a handgun, a Colt .38 caliber handgun, without first having obtained a permit to carry the same, N.J.S.A. 2C:39-5(b) (count eight); and unlawful possession of a handgun, a Smith & Wesson .38 caliber handgun, without first having obtained a permit to carry the same, N.J.S.A. 2C:39-5(b) (count nine).[1]
The co-defendants' cases were severed, and defendant stood trial alone. A jury found defendant guilty on all counts, with the exception of counts six and eight relating to the Colt .38 caliber handgun. The trial judge merged count seven into count five, and the conviction for felony murder (count four) into the conviction on count two for murder, and sentenced defendant on that count to life imprisonment, with thirty years to be served without parole. The judge also imposed concurrent sentences on the other convictions. Finally, the appropriate monetary penalties and assessments were also imposed. Defendant appeals. We affirm.
According to the State's proofs, on January 27, 1997, Jason Means was driving his 1995 Hyundai Elantra when he saw his friend, Lawrence McGriff, in front of Means's home. He picked up McGriff, and they continued to drive around until they observed Rahmill Thomas. They picked up Thomas who sat in the rear of the vehicle. They entered the borough of Roselle and observed defendant. At McGriff's suggestion, they invited defendant into the car. Defendant sat next to Thomas in the rear of the vehicle. McGriff was in the front passenger seat. Means said he and McGriff had been drinking Bacardi. While they were driving around, defendant and McGriff began discussing "robbing someone." At some point, Means agreed to participate in a robbery with McGriff and defendant.[2] According to Means, it was agreed that if they "came across someone who looked vulnerable that we were going to rob him." While in the car, McGriff discharged his gun, a Colt .38 caliber revolver. In addition, defendant told the others that he had a gun with him.
Means realized he needed gas because they "had been riding around for a long period of time." Defendant suggested they rob the gas station. According to Means, "[t]he plan was for [him] to go get the gas, to draw the attendant out and as he was out of the booth, they would come up and rob him."
Means dropped McGriff and defendant off near the gas station. He then drove to the gas station with Thomas and obtained gas in the amount of $3.00, which had been given to him by defendant. Means then drove to the location where he had let McGriff and defendant out of the car. They had agreed that Means would park his car at that location and defendant and McGriff would return there after completing the robbery. Means observed defendant and McGriff approach the gas station. As he was waiting for them to return, he heard gunshots. Defendant ran back to the car. According to Means, defendant was "hysterical" and wanted to leave *338 McGriff at the gas station. Within seconds, McGriff returned. After defendant and McGriff entered the vehicle, they began to argue about who had shot Ramon Medina, the gas station attendant. Means began to argue with defendant because he wanted Means "to pull off quickly and fast and flee the scene quickly, real fast." Means refused to do so because "it was too obvious." An argument developed and Means "ended up putting [defendant] out of the car, along with Thomas.
Means returned to his home with McGriff. They sat on the porch. McGriff gave Means his gun and told him that defendant had shot the victim. He asked Means to dispose of the gun. Means wrapped the gun inside a shirt and placed it above a drop-ceiling panel in his home. The day after the robbery, defendant asked his friend Travelle Jackson to hide his gun, a Smith & Wesson .38 caliber revolver. Two bullets found at the scene, including one found in the lining of the victim's jacket, were determined to have been fired from a Smith & Wesson .38 caliber revolver.
Concerned that he may be implicated in the robbery because his car had been used, Means called the police to report the incident, claiming to be an innocent witness. He initially gave a statement to the police that both he and McGriff were getting gas when the robbery took place. He made no mention of defendant. However, the police received other information that made Means's statement seem untruthful.
An eyewitness, Joseph Nyars, had heard the shots and told the police he saw two men dressed in black, one near the street and the other closer to the gas station. They met at the street, screamed, and ran away. From his vantage point, Nyars could not see the victim; however, he saw Medina's Doberman pinscher standing nearby.
Police from Linden and Roselle were dispatched to the scene. Linden Patrolman Peter Hammer observed the victim lying face down on the ground. He was lying in a pool of blood and did not appear to have any sign of life. He had been shot four times. The victim was pronounced dead by medical personnel who arrived at the scene within five to ten minutes. Hammer observed a parking ticket laying on the ground near the body. Ultimately, police determined that the summons had been issued to McGriff. Hammer also observed a bullet by the pumps and one laying on the floor in the booth. Two bullets had passed through the victim's jacket.
The police went to McGriff's home, and he accompanied them to the station for questioning. During the questioning, the officers discovered that McGriff had what appeared to be a fresh dog bite on his leg and blood on his clothing. While the police were questioning McGriff, he directed them to a safe in his grandfather's house. The police brought the safe back to police headquarters and McGriff opened it. Sergeant Edward Fitzgerald of the Union County Prosecutor's Office observed and seized five copper-jacketed bullets.
As previously noted, during the course of the investigation the police obtained information that brought into question the truth of Means's initial statement. When confronted with the information, Means gave a second statement in which he admitted his involvement and told the police that defendant and McGriff carried out the robbery. He then informed the police that he had hidden McGriff's gun, the Colt .38 revolver, in his house. The police retrieved the gun. It was loaded with one copper-jacket bullet and five spent Remington-Peters shells. A ballistics examination determined that the bullet that caused the fatal wound was discharged *339 from the Colt revolver. In addition, McGriff's blood and the victim's blood were found on the gun. Randy Toth, of the State Police Ballistics Unit, examined the gun retrieved from Means's home and determined that the Remington-Peters shells and bullets had been discharged from that weapon.
On January 28, 1997, Shane Burns, a police informant who was also a friend of defendant, convinced defendant to turn himself in to the police. At the station, in the presence of Burns, defendant invoked his right to counsel. Burns spoke to Linden Detective Salvator Bivona who told him to go back and speak to defendant and convince him to give a statement. Ultimately, Burns prevailed upon defendant to give a statement without his lawyer, maintaining that the police would go easy on defendant if he gave a statement. In addition, Burns vouched for Bivona's trustworthiness based on the help the detective had given him in the past. Defendant then told Burns that he had given his gun to Jackson. Ultimately, the police were able to retrieve the gun. The trial judge suppressed defendant's statements and further deemed the gun inadmissible because it was the fruit of the poisonous tree. However, during trial, after conducting an evidentiary hearing, the judge reconsidered and permitted the introduction of the gun into evidence.
On this appeal, defendant raises the following arguments:
POINT I
NEITHER THE INEVITABLE DISCOVERY RULE NOR THE INDEPENDENT SOURCE RULE RENDERED THE SMITH & WESSON HANDGUN AND TRAVELLE JACKSON'S TESTIMONY ADMISSIBLE, AND THE TRIAL COURT'S RULING TO THE CONTRARY WAS REVERSIBLE ERROR.
A. THE EVIDENCE WAS NOT ADMISSIBLE UNDER THE INEVITABLE DISCOVERY EXCEPTION.
B. THE INDEPENDENT SOURCE RULE IS WHOLLY INAPPLICABLE IN THIS CASE.
POINT II
BY ADMITTING HEARSAY TESTIMONY THAT DEFENDANT SHOT THE VICTIM, THE TRIAL COURT DEPRIVED DEFENDANT OF HIS RIGHT TO CONFRONT WITNESSES, HIS RIGHT TO DUE PROCESS OF LAW AND HIS RIGHT TO A FAIR TRIAL. [U.S. Const. Amends. VI, XIV; N.J. Const. (1947), Art. I, ¶¶ 1, 9, 10].
POINT III
THE TRIAL COURT IMPROPERLY INVADED THE JURY'S DOMAIN WHEN SHE TOLD THEM, DURING HER INSTRUCTIONS, THAT JASON MEANS' PRIOR INCONSISTENT STATEMENT WAS FALSE.
In his supplemental brief, pro se, defendant raises the following arguments:
POINT I
NEITHER THE INEVITABLE DISCOVERY RULE NOR THE INDEPENDENT SOURCE RULE RENDERED THE SMITH & WESSON HANDGUN AND TRAVELLE JACKSON'S TESTIMONY ADMISSIBLE, AND THE TRIAL COURT'S RULING TO THE CONTRARY WAS REVERSIBLE ERROR.
A. THE EVIDENCE WAS NOT ADMISSIBLE UNDER THE INEVITABLE DISCOVERY EXCEPTION.
B. THE INDEPENDENT SOURCE RULE IS WHOLLY INAPPLICABLE IN THIS CASE.
*340 C. THE COURT MADE A RULING BASED ON NONEXISTENT TESTIMONY.
We first consider defendant's contention that the trial judge erred in concluding that the Smith & Wesson handgun and Travelle Jackson's testimony were admissible under both the inevitable discovery rule and the independent source rule. As previously noted, prior to trial, the judge suppressed defendant's statements to the police as having been obtained in violation of his Fifth and Sixth Amendment rights. Accordingly, the judge also denied the State the right to admit certain evidence, which included: (1) the .38 caliber Smith & Wesson handgun, which forensic experts had determined had fired a bullet later discovered on the victim's body, and (2) the testimony from Jackson that defendant had given him the gun. The judge determined that the evidence was inadmissible because it was discovered as a result of defendant's statement, and was therefore inadmissible as fruit of the poisonous tree. Nevertheless, on the last day of trial, over defendant's objection, the judge reconsidered and allowed the gun to be admitted into evidence. She similarly allowed Jackson's testimony that on the afternoon following the shooting that defendant, a friend of his, had given it to him to hide.
Before allowing the challenged evidence to be introduced, the judge conducted a hearing outside the presence of the jury pursuant to N.J.R.E. 104(a). At that hearing, Jackson said defendant gave him the gun in January 1997. He said he knew defendant for "[a]bout two and a half years," and they were "friends." He said defendant gave him the gun the day after the shooting. Jackson said defendant told him "to put [the] gun up." Jackson understood that to mean "[t]o put it away." Although he first took the gun to his home, after he heard that it had been used in a robbery, he took it to St. Mark's Park where he placed the gun in a hole in a tree.
On January 28th, he retrieved the gun and gave it to Sergeant Bivona. According to Jackson, Burns told him to retrieve the gun and give it to Bivona. However, Jackson said that even if Burns or Bivona had not come to him, he ultimately would have given the gun to the police because he knew it had been involved in a robbery. Specifically, he said he would have turned the gun in to Bivona because they had "a past relationship." In addition, after his recollection was refreshed from a prior statement he had given, Jackson also said he would have turned the gun in because he was concerned that it was in a public park and "kids or someone might have found it and they might have gotten hurt."
At the hearing, on cross-examination, Jackson said that the police suggested to him that he would have turned the gun in even if Burns had not approached him. However, on cross-examination, he also said he "was going to give the gun in ... when [defendant] turned himself in." He acknowledged that Burns had told him "that it was better that [he] give the gun up because [he] would get in trouble" and that is why he retrieved the gun. The judge found Jackson's statement credible that he would have turned the gun in once he knew that defendant had surrendered. The judge also determined, by inference, that the police "would have followed investigatory procedures that would have inevitably resulted in the discovery of the gun." She believed the police would have eventually gone to Jackson, and he would have turned the gun over to them. She found by clear and convincing evidence that the police would have done everything humanly possible to find a loaded gun that "may be out in public [posing] a great danger to the public." Thus, the judge *341 found the evidence admissible under both the inevitable discovery doctrine and the independent source doctrine.
Where, as here, physical evidence is discovered as a result of information gained during the course of an illegally obtained confession, the fruit of the poisonous tree doctrine is implicated. Simply put, when the State seeks to make use of evidence derived from an illegally obtained confession, it must be determined whether the evidence sought to be introduced is tainted as being the fruit of the poisonous tree. Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307, 312 (1939). To give full effect to the exclusionary rule, it is not merely the evidence that was unconstitutionally obtained that is excluded, but also, generally, its use. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319, 321 (1920). However, the evidence improperly obtained does not necessarily "become sacred and inaccessible" for all purposes. Ibid. Thus, if the challenged evidence is obtained from an independent source it is admissible. Nardone, supra, 308 U.S. at 341, 60 S.Ct. at 268, 84 L.Ed. at 311-12; Silverthorne, supra, 251 U.S. at 392, 40 S.Ct. at 183, 64 L.Ed. at 321.
In addition, the evidence may be admissible under the doctrine of attenuation. Under that doctrine, if the causal connection between the illegal conduct and obtaining the evidence has become so attenuated as to dissipate the taint, the evidence is admissible. Nardone, supra, 308 U.S. at 341, 60 S.Ct. at 268, 84 L.Ed. at 312. Consequently, simply because evidence was discovered as a result of the illegal actions of the police does not necessarily require its exclusion as fruit of the poisonous tree. Wong Sun v. United States, 371 U.S. 471, 487-88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455 (1963). The question to be resolved is whether the challenged evidence was acquired by exploitation of the primary "illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Id. at 488, 83 S.Ct. at 417, 9 L.Ed.2d at 455 (citation omitted).
An additional exception to the fruit of the poisonous tree doctrine is the inevitable discovery rule. In order for the inevitable discovery rule to be applied, the State must prove "by clear and convincing evidence that had the illegality not occurred, it would have pursued established investigatory procedures that would have inevitably resulted in the discovery of the controverted evidence, wholly apart from its unlawful acquisition." State v. Sugar, 100 N.J. 214, 240, 495 A.2d 90 (1985) (Sugar II).
These exceptions to the fruit of the poisonous tree doctrine have emerged in an effort to reasonably accommodate and harmonize, on the one hand, the State's interest in assuring that those who have violated our criminal laws receive their just punishment and, on the other hand, the deterrent purpose of the exclusionary rule. The exceptions are designed to ensure that neither the State's interest in convicting the guilty nor the deterrent purpose of the exclusionary rule unnecessarily or unreasonably trumps the other. A rationale of the exclusionary rule is that the prosecution should not be put in a better position than it would have been if no illegality had occurred. Nix v. Williams, 467 U.S. 431, 443, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377, 387 (1984); State v. Sugar, 108 N.J. 151, 164, 527 A.2d 1377 (1987) (Sugar III). On the other hand, the exceptions to the rule, while recognizing its purpose, are designed to accommodate the public interest by ensuring that the police are not put in a worse *342 position than they would have been if no police error or misconduct had occurred. Nix, supra, 467 U.S. at 443, 104 S.Ct. at 2508, 81 L.Ed.2d at 387; Sugar III, supra, 108 N.J. at 164, 527 A.2d 1377. A noted commentator has observed that the inevitable discovery rule is, in a sense, a variation of the independent source rule. 3 Wayne R. LaFave et al., Criminal Procedure § 9.3(d), at 351-52 (2d ed.1999). Nevertheless, he has observed that it differs from the independent source rule because "the question is not whether the police did in fact acquire certain evidence by reliance upon an untainted source but instead whether evidence found because of an earlier violation would inevitably have been discovered lawfully." 3 id. at 352.
Here, as previously noted, the judge accepted as credible Jackson's testimony that he intended to turn the gun in to the police once he knew the defendant had surrendered. That finding is entitled to considerable deference. State v. Johnson, 42 N.J. 146, 161, 199 A.2d 809 (1964). Moreover, the judge concluded that the police would have utilized normal investigatory procedures and canvassed the park in an effort to locate the gun. We must give deference to the findings of the trial court, "which are substantially influenced by [its] opportunity to hear and see the witnesses and to have the `feel' of the case, which a reviewing court cannot enjoy." Ibid. Thus, we must consider the proofs as a whole and "determine whether the findings made could reasonably have been reached on sufficient credible evidence present in the record." Id. at 162, 199 A.2d 809. The fact "[t]hat the case may be a close one ... has no special effect." Ibid. Here, our review of the record leads to the inescapable conclusion that the judge's factual findings are supported by sufficient credible evidence present in the record. Consequently, we accept them.
In rendering her opinion, the judge noted the State's contention that Jackson would have surrendered the weapon was the "strongest argument." We acknowledge that when read literally, an argument could be made that the first prong of the inevitable discovery exception had not been met. It could be urged that the gun was received not as a result of "proper, normal and specific investigatory procedures" but, rather, by the independent act of Jackson in turning the gun over. See Sugar II, supra, 100 N.J. at 238, 495 A.2d 90.
We do not believe the inevitable discovery exception should be given such a restrictive application. Indeed, it has been noted that the exception is applicable where the discovery would have come through the efforts of a private party who would have presented the evidence to the police. 3 LaFave, supra, § 9.3(e), at 353 (citing United States v. Kennedy, 61 F.3d 494, 500-01 (6th Cir.1995) (discussing the airline's "routine procedure" of opening lost luggage), cert. denied, 517 U.S. 1119, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1996); United States v. Hernandez-Cano, 808 F.2d 779, 780-83 (11th Cir.) (holding that when police made an illegal search of defendant's luggage, they interrupted a lawful private inspection which would have led to the evidence), cert. denied, 482 U.S. 918, 107 S.Ct. 3194, 96 L.Ed.2d 682 (1987); Oken v. State, 327 Md. 628, 612 A.2d 258, 270-71 (1992) (relating the rule to the customary cleaning procedures of a motel), cert. denied, 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993); Rubin v. State, 325 Md. 552, 602 A.2d 677, 686-87 (1992) (determining that evidence obtained from illegal search conducted at the office of a defense attorney was nonetheless admissible because "the attorney had an ethical obligation ... to deliver the physical items to the police ... in advance of trial")). *343 Likewise, here, we conclude that the doctrine is applicable, even though the inevitable discovery would have come through the efforts of Jackson, rather than as a result of a specific investigation undertaken by the police in order to complete the investigation of the case.[3]
We next consider defendant's contention that the judge erred in admitting, under the co-conspirator exception to the hearsay rule, testimony that McGriff told Means that defendant had shot the victim. Specifically, defendant contends that the judge erred in allowing Means to testify that immediately after he arrived at his home with McGriff following the robbery, McGriff said that defendant had shot the victim. The judge determined that the testimony was admissible under the co-conspirator exception to the hearsay rule. See N.J.R.E. 803(b)(5).
"[A] statement, other than one made by the declarant while testifying, [which is] offered in evidence to prove the truth of the matter asserted," is hearsay. N.J.R.E. 801(c). Generally, "[h]earsay is not admissible except as provided by [our] rules [of evidence] or by other law." N.J.R.E. 802. The exceptions to the hearsay rule primarily "are justified on the ground that `the circumstances under which the statements were made provide strong indicia of reliability.'" State v. White, 158 N.J. 230, 238, 729 A.2d 31 (1999) (quoting State v. Phelps, 96 N.J. 500, 508, 476 A.2d 1199 (1984)).
As an exception to the hearsay rule, N.J.R.E. 803(b)(5) permits a statement to be admitted against a party if it was "made at the time the party and the declarant were participating in a plan to commit a crime or civil wrong and the statement was made in furtherance of that plan." In order to be admitted pursuant to N.J.R.E. 803(b)(5), the co-conspirator exception, (1) "the statement must have been made in furtherance of the conspiracy"; (2) it "must have been made during the course of the conspiracy"; and (3) there must be evidence, independent of the hearsay, of not only the conspiracy but also defendant's relationship to it. Phelps, supra, 96 N.J. at 509-10, 476 A.2d 1199. The State bears the burden of proving that these prerequisites to admissibility have been met by a "fair preponderance of the evidence." Id. at 517-19, 476 A.2d 1199.
Defendant first contends that the statement was not made in furtherance of the conspiracy. We disagree. A statement about past events is considered still to be in furtherance of a conspiracy if it serves a "current purpose such as to promote cohesiveness, provide reassurance to a co-conspirator, or prompt one not a member of the conspiracy to respond in a way that furthers the goals of the conspiracy." State v. Taccetta, 301 N.J.Super. 227, 253, 693 A.2d 1229 (App.Div.), certif. denied, 152 N.J. 187, 704 A.2d 17 (1997); accord State v. Soto, 340 N.J.Super. 47, 63, 773 A.2d 739 (App.Div.), certif. denied, 170 N.J. 209, 785 A.2d 438 (2001). We conclude that where, as here, a statement is made by a co-conspirator in an effort to enlist aid or support in disposing of a weapon used in the commission of the crime, it is made in furtherance of the conspiracy, notwithstanding the fact that the crimes had already been committed. Thus, the first condition of admissibility is satisfied.
*344 The statement was made, at the very least, to induce Means to further the goals of the conspiracy by disposing of the weapon. It is reasonable to infer that McGriff's statement that defendant, rather than he, shot the victim was designed to reassure Means that he was not disposing of the murder weapon. Consequently, we conclude that the judge did not mistakenly exercise her discretion in concluding that the statement was made in furtherance of the conspiracy.[4]
Defendant also contends that McGriff's statement to Means came only after the robbery and shooting were completed. Hence, defendant argues that the goal of the conspiracy had been fully accomplished and the conspiracy was then over. Thus, he asserts that the statement was not made "in the course of" the conspiracy. We reject that contention. Mere completion of the criminal act does not necessarily end the conspiracy for purposes of this rule. "A statement is considered to have been made in the course of a conspiracy even when the crimes have been completed, as long as all of the conspiracy's objectives and goals have not yet been met." Soto, supra, 340 N.J.Super. at 62, 773 A.2d 739; see State v. Hunt, 115 N.J. 330, 367-68, 558 A.2d 1259 (holding that a statement by a co-conspirator that defendant had just killed someone made at the time the co-conspirator was seeking the assistance of the person in disposing of evidence of the crime was made in furtherance of the conspiracy), reconsideration denied, 117 N.J. 152, 564 A.2d 873 (1989); State v. Harris, 298 N.J.Super. 478, 488, 689 A.2d 846 (App.Div.) (finding that a tape-recorded telephone conversation between co-conspirators concerning payment due defendant for a murder that had already been committed was made in the course of the conspiracy and was admissible), certif. denied, 151 N.J. 74, 697 A.2d 546 (1997); State v. Cherry, 289 N.J.Super. 503, 523-24, 674 A.2d 589 (App.Div.1995) (holding that statements made after a murder by a co-conspirator to his wife, which explained her alibi role, were made in the course of the conspiracy because the husband was still planning to conceal himself from detection and get rid of evidence). Clearly, the statement made by McGriff was still in the course of the conspiracy, although the robbery and murder had been completed, because it was designed to encourage Means to dispose of a weapon that could have been linked to the crime.
Defendant does not argue on appeal that the third condition for admissibility, that there must be evidence of the existence of the conspiracy and defendant's relation to it, has not been met. For the sake of completeness, we note that our review of the record leads to the inescapable conclusion that the State's proof of the existence of a conspiracy and defendant's relationship to it was overwhelming. Consequently, the third condition was met.
We have carefully considered the record, the briefs filed, the arguments of counsel, and the applicable law and conclude that all other issues raised by defendant on appeal are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).
Affirmed.
NOTES
[1] Lawrence McGriff and Jason Means were also named as defendants in the indictment. Counts four through nine of the indictment named them as well as defendant. Count one charged McGriff with murder. Count three charged Means with murder.
[2] Means said that Thomas, who was a juvenile, did not want to participate. Thomas was not charged with the crimes.
[3] At oral argument, the State conceded that our analysis should be under the inevitable discovery exception rather than the independent source exception. Consequently, because we have determined that the evidence was admissible under the inevitable discovery exception, we do not consider the judge's alternative conclusion that the evidence was also admissible under the independent source exception.
[4] We note that neither trial counsel nor appellate counsel argued that McGriff's statement that defendant shot the victim should have been excluded because its probative value was substantially outweighed by the risk of undue prejudice. See N.J.R.E. 403. We decline to find, on our own initiative, that the judge should have sua sponte considered application of N.J.R.E. 403.