# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2113-24

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ABAYUBA RIVAS,

    Defendant-Appellant.

_____

Argued January 13, 2026 – Decided February 25, 2026

Before Judges Sumners and Chase.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Union County, Indictment No. 15-02-0114.

Scott M. Welfel, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Scott M. Welfel, of counsel and on the briefs).

Milton S. Leibowitz, Assistant Prosecutor, argued the cause for respondent (William A. Daniel, Union County Prosecutor, attorney; Michele C. Buckley, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Our Supreme Court reversed defendant Abayuba Rivas's conviction for first-degree aggravated manslaughter and second-degree desecration of human remains and related offenses[1] and ordered a new trial because his March 19, 2014 confession to killing his wife, Karla Villagra Garzon, should have been suppressed. State v. Rivas, 251 N.J. 132, 138-39 (2022). Following remand, the motion court dismissed defendant's motion to suppress other statements and evidence of Karla's body as the fruit of a suppressed March 18 confession.

On leave to appeal granted, defendant argues:[2]

POINT I

---

[1] The related offenses were: fourth-degree unlawful possession of a weapon; third-degree possession of a weapon for an unlawful purpose; second-degree endangering the welfare of a child; third-degree hindering one's own apprehension by concealment or destruction of evidence; and two counts of third-degree hindering one's own apprehension by giving false information to law enforcement officers.

[2] In seeking leave to appeal, defendant included his contention that the motion court erroneously denied his motion to suppress his February 27, 2014 statement. We granted leave to appeal to all contentions raised. However, because defendant did not address the suppression of his February 27, 2014 statement in his appeal merits brief it is deemed waived. See Petro v. Platkin, 472 N.J. Super. 536, 567 (App. Div. 2022); N.J. Dep't of Env't Prot. v. Alloway Twp., 438 N.J. Super. 501, 505 n.2 (App. Div. 2015) ("An issue that is not briefed is deemed waived upon appeal."); Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2026).

THE MARCH 13TH STATEMENT SHOULD HAVE BEEN SUPPRESSED BECAUSE DEFENDANT DID NOT KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY WAIVE HIS MIRANDA[3] RIGHTS.

POINT II

[KARLA'S] BODY MUST BE SUPPRESSED AS FRUIT OF THE POISONOUS TREE OF THE ILLEGAL MARCH 18TH INTERROGATION.

A. UNITED STATES V. PATANE[4] DOES NOT FORECLOSE APPLICATION OF THE EXCLUSIONARY RULE TO SUPPRESS PHYSICAL EVIDENCE DISCOVERED PURSUANT TO A CONFESSION OBTAINED IN VIOLATION OF AN INVOCATION OF THE RIGHT TO COUNSEL.

B. THE STATE FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT [KARLA'S] BODY WOULD INEVITABLY HAVE BEEN DISCOVERED ABSENT [DEFENDANT'S] DISCLOSURE OF THE LOCATION DURING THE UNLAWFUL, NOW SUPPRESSED MARCH 18TH STATEMENT.

Having considered the parties' arguments, the record, and applicable law,

we affirm the motion court's order that evidence of Karla's body should not be

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

[4] 542 U.S. 630 (2004).

A-2113-24

suppressed. However, we reverse the court's order declining to suppress defendant's March 13 statement.

I.

Circumstances Forming the Basis of Defendant's Appeal

A. Police Investigation

On February 24, 2014, defendant reported to the City of Elizabeth police that his wife was missing and voluntarily appeared at the Elizabeth police station on February 27 for an interview with police detectives. Without being read his Miranda rights, defendant recounted the events leading up to his wife's death. He stated that after his wife said she needed $300 for a CAT scan to address her sinus problems, they got into a fight with her calling him "gay" and she left for the pharmacy. Defendant authorized searches of his apartment, vehicles, computer, cell phone, and agreed to provide a buccal swab and take a polygraph examination on March 5.

A search of defendant's apartment led to seizure of a shirt with a stain of Karla's blood and defendant's DNA. The search of defendant's car revealed stains which, except for one of the samples matching Karla's DNA, were too small to draw any forensic conclusions. A cadaver dog's hit identified the

4

presence of human remains in the master bedroom, by a pair of brown work boots, and in the car's front passenger seat, driver's seat, and rear cargo area.

On March 5, Elizabeth detectives interviewed defendant and administered a polygraph test. Before administering the test, defendant was informed of his Miranda rights, including that anything he said could be used against him in court, and that he was entitled to an attorney if he could not afford one, among other advisements. Defendant signed a written waiver of his Miranda rights. During the test, defendant was asked if he killed his wife, the nature of his relationship with Karla, and the circumstances of the crime. Defendant denied killing her.

On March 6, the detectives learned that a police vehicle's license plate reader (L.P.R.) had recorded defendant's license plate on Division Street in Elizabeth in the early morning of February 24. After canvassing businesses on Division Street, the police obtained two surveillance videos confirming that a car consistent with defendant's car was on Division Street that early morning.

Consequently, the detectives asked to interview defendant on March 13, at the Union County Child Advocacy Center. Defendant agreed and brought his daughter. Detectives informed defendant that the purpose of the interview was to address "some follow-up questions." Defendant claims the detectives told

A-2113-24

him the interview would last ten to fifteen minutes. The interview instead lasted around eight-and-a-half hours, from 10:25 a.m. to 6:35 p.m.

Defendant was mirandized and waived his rights in writing. Throughout the interview, defendant was provided with water and pizza and was permitted to use the bathroom around 4:58 p.m. Detectives sat close to defendant at times but did not threaten or physically assault him. Initially, defendant appeared relaxed and spoke in a conversational tone. At one point, detectives repeatedly told defendant that he failed the March 5 polygraph test and that they knew he was lying. In addition, the detectives told defendant that his vehicle was seen in a surveillance video the night his wife disappeared. Defendant then admitted that he left the house that evening without his daughter "for a while." Defendant was consequently arrested for endangering the welfare of a child and hindering apprehension or prosecution by providing false information.

On March 18 and March 19, defendant confessed to killing Karla and disposing of her body in an abandoned house at 9 Southern Boulevard in Chatham. Defendant revealed that on the night of Karla's death, he and Karla had gotten into a verbal and physical altercation in the kitchen. After she bit his finger, he punched her, which resulted in her slapping him. Defendant grabbed a meat tenderizer from the counter and hit her twice on the side of the head.

6

Believing that she was dead, defendant put tape over her eyes, taped her hands, and placed her body in a suitcase. He left his sleeping daughter in the apartment and transported Karla's body to the basement of 9 Southern Boulevard. Police recovered Karla's body on March 18.

B. Pretrial Suppression Hearing

On June 5, 2018, prior to the start of trial on June 19, the trial court conducted a suppression hearing regarding the inevitable discovery of Karla's body. Anne Carbone, Alan McClay, and Elizabeth Police Detective Louchaun Holmes testified on behalf of the State. Defendant did not present any witnesses.

Carbone owned 9 Southern Boulevard in Chatham where Karla's body was found, and the adjacent lot on River Road, containing two houses. Together the properties comprised about seven acres. The house at 302 River Road was about 500 feet from 9 Southern Boulevard, and the second, 304 River Road, which was occupied by tenant Tim Ellison, was at the end of the seven acres area. Carbone leased 9 Southern Boulevard to Alan McClay in 2012.

Due to Hurricane Sandy's damage to 9 Southern Boulevard in November 2012, McClay rented a room in Ellison's home at 304 River Road. McClay, however, kept most of his personal property at 9 Southern Boulevard due to the limited space at Ellison's house. In 2014, Carbone asked McClay to remove his

property from 9 Southern Boulevard because she planned to sell the property. Carbone noted that she visited the property every day.

McClay confirmed Carbone's testimony. He added that he checked in on his personal belongings at 9 Southern Boulevard every few weeks, and that he would go throughout the house to make sure everything was okay and nothing was stolen.

Detective Holmes testified regarding his missing person's investigation of Karla. He stated that between February 24, 2014 and March 18, 2014, when Karla's body was recovered, he reviewed her cell phone records and E-ZPass records, canvassed the local area, and checked the National Crime Information Center (NCIC), a database containing information about unidentified bodies in the United States, to see if a body matched Karla. He noted if Karla's body had not been recovered on March 18, he would have continued his preparation of obtaining search warrants for defendant's E-ZPass records, cell phone, car GPS, and continued searching the NCIC database.

Detective Holmes stated he also contacted English and Spanish newspapers and reporters with a "plea to the community as well as [defendant] . . . [and] anybody [else who had] seen [Karla] at all. Any information that could lead to helping us find her." Additionally, he posted fliers throughout Karla's

A-2113-24

neighborhood and the "Walgreen's where she was supposed to [have been]" with "[her] photograph . . . height, weight, age and what she was wearing at the time she was reported missing." He noted that police officers also canvassed the neighborhood, "going door to door to see if [they] could obtain any further information that would help [them] in the investigation."

Three days after the suppression hearing, the trial court denied defendant's motion to suppress Karla's body as evidence. The court reasoned that "an analysis and application of the inevitable discovery exception . . . may not be required" because while defendant's confession and statement about the location of Karla's body on March 18 were suppressed, he found that defendant's voluntary statement on March 19 was sufficiently attenuated and thereby admissible. Accordingly, the body was also admissible because it was "wholly independent from and not derivative of the March 18 suppressed statement." The court further explained that "law enforcement and private [citizens] would have inevitably discovered . . . [Karla's body] . . . and that the discovery would have occurred completely independent of the information provided by defendant on March 18."

C. Trial and Appeals

9

On July 19, 2018, a jury found defendant guilty of the lesser-included offense of first-degree aggravated manslaughter, second-degree desecration of human remains, and related offenses. We affirmed defendant's convictions. State v. Rivas, No. A-1994-18 (App. Div. July 20, 2021) (slip op. at 2, 10-11). Our Supreme Court reversed and remanded for a new trial on the basis that defendant's March 19, 2014 confession to killing his wife—"a mirror image of his [suppressed] March 18 confession"—should be suppressed because it "had the clear capacity to cause an unjust result and cannot be deemed harmless error." Rivas, 251 N.J. at 138-39.

After the Supreme Court remand and before retrial, defendant moved to suppress his February 27 and March 13 statements to the police, and evidence of Karla's body as the fruit of a suppressed March 18 confession. The motion court, different from the court that ruled on defendant's pretrial motions and presided over his trial, denied the motion as well as defendant's reconsideration application. The court issued two written decisions, forty pages and thirty-two pages, respectively.

Pertinent to the issues on appeal, the motion court held that it would "follow the law of the case doctrine[] and . . . adopt the admissibility of the [March 13] statement[]" based on its "substantial[] agree[ment] with the factual

findings and conclusions of law" by the trial court. Addressing the factors in State v. Reldan, 100 N.J. 187, 205-06 (1985), the court found that the prosecution was not acting in bad faith, nor could it be said that it was seeking an unfair advantage as it was not the party seeking to relitigate the issue. The court further found that failing to relitigate the suppression of the March 13 statement would not be "significantly unfair to . . . [d]efendant" because he had "a full opportunity to address this issue before [the trial court]."

Nonetheless, the court addressed and rejected the merits of defendant's contention that his March 13 statement was involuntary. The court determined defendant was given breaks and food; he was neither threatened nor coerced into confessing; and, the State's delay in arresting him for endangering the welfare of a child and hindering apprehension or prosecution by providing false information was not a tactic to get defendant to waive his rights because they had no proof that defendant was driving his car when it was spotted by the L.P.R.

On reconsideration, the court did not change its ruling and determined there was no justification for an evidentiary hearing. The court rejected defendant's argument that his separation from his daughter or "physical intimidation" rendered his statement involuntary. The court also found no merit to defendant's argument that the inadmissibility of his polygraph test should

render the March 13 statement inadmissible. It reasoned that unlike the situation in State v. O'Neill, 193 N.J. 148 (2007), the Elizabeth police detectives "ha[d] no way of knowing that the polygraph itself would be inadmissible since the admissibility hinges on both the State and the [d]efense stipulating to its admissibility." Finally, the court rejected defendant's argument that Karla's body should be suppressed as fruit of the poisonous tree because it fell under the inevitable discovery doctrine. Applying State v. Sugar, 108 N.J. 151, 156-67 (1987) (Sugar III), the court held that the police investigation efforts and private parties (Carbone and McClay) would have discovered Karla's body independent of defendant's statement.

## II.

### Appellate Review of an Order Suppressing an Interrogation Statement

"The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence [Rule][] 503." State v. S.S., 229 N.J. 360, 381-82 (2017) (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). "The administration of Miranda warnings ensures that a defendant's right against self-incrimination is protected in the inherently coercive atmosphere of custodial interrogation." State v. A.M., 237 N.J. 384,

397 (2019). To that end, a person subject to custodial interrogation "must be adequately and effectively apprised of his [or her] rights." Nyhammer, 197 N.J. at 400 (quoting Miranda, 384 U.S. at 467).

Before any evidence acquired through a custodial interrogation can be used against a defendant, "[t]he burden is on the prosecution to demonstrate not only that the individual was informed of [their] rights, but also that [they] . . . knowingly, voluntarily, and intelligently waived those rights." Id. at 400-01. Thus, "the State shoulders the burden of proving . . . that a defendant's confession was actually volunteered and that the police did not overbear the will of the defendant." State v. Hreha, 217 N.J. 368, 383 (2014).

In turn, the motion court must determine whether the State has satisfied its heavy burden by proof beyond a reasonable doubt "based upon an evaluation of the totality of the circumstances." State v. Yohnnson, 204 N.J. 43, 59 (2010). A totality-of-the-circumstances analysis requires the court to consider such factors as defendant's "'. . . age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature[,] and whether physical punishment or mental exhaustion was involved.'" State v. Presha, 163 N.J. 304, 313 (2000) (quoting State v. Miller, 76 N.J. 392, 402 (1978)).

"Generally, on appellate review, a [motion] court's factual findings in support of granting or denying a motion to suppress must be upheld when 'those findings are supported by sufficient credible evidence in the record.'" S.S., 229 N.J. at 374 (quoting State v. Gamble, 218 N.J. 412, 424 (2014)); see, e.g., State v. Dorff, 468 N.J. Super. 633, 643-44 (App. Div. 2021).  This court must "accept the [motion] court's factual findings unless they are not supported by sufficient credible evidence in the record."  Dorff, 468 N.J. Super. at 644.  "In contrast, we review the [motion] court's legal conclusions de novo."  Ibid.  "Accordingly, [this court] [is] not bound by a [motion] court's interpretations of the legal consequences that flow from established facts."  Ibid.

Moreover, "a [motion] court's factual findings should not be overturned merely because an appellate court disagrees with the inferences drawn and the evidence accepted by the [motion] court or because it would have reached a different conclusion."  S.S., 229 N.J. at 374.  Indeed, "[a]n appellate court should not disturb a [motion] court's factual findings unless those findings are 'so clearly mistaken that the interests of justice demand intervention and correction.'"  Ibid. (quoting Gamble, 218 N.J. at 425).  This deferential standard of appellate review also applies to the motion court's "factual findings based on a video recording or documentary evidence."  Id. at 381.

III.

Suppression of the March 13 Interrogation Statement

A. Defendant's Contentions

Defendant contends that his March 13 statement should be suppressed because he did not knowingly, intelligently, and voluntarily waive his Miranda rights. He points to the totality of circumstances that favor invalidating his Miranda waiver.

Defendant emphasizes that his interrogation lasted eight hours, instead of the ten to fifteen minutes he was initially told, and that he was cold and hungry even though he was given food about halfway through the interrogation. He stresses that the detectives' refusal to let him see his daughter, despite his asking about her well-being sixteen times, constituted a coercive measure rendering his Miranda waiver involuntary. Defendant asserts the detectives "employed coercive pressure through physical contact"; touching him at least thirty-one times, including his arm or shoulders, and raising their voices in an accusatory manner.

Defendant argues the detectives misled him into providing a statement by telling him that providing information "would actually benefit him." For example, he was told: "You don't want to look like the monster at the end of

15

the day that you have no remorse at all for [Karla] . . . [w]e're trying to help you not be that guy today," "[b]ut you're not being honest . . . I can't help you make this right if you're not honest with yourself," and "[w]e're trying to throw you that life preserver."

Defendant contends he did not knowingly waive his Miranda rights because the detectives "deliberately . . . misled [him] as to his true legal status" by convincing him that the interview would only last ten to fifteen minutes when they already had probable cause to arrest him for providing false information to a law enforcement officer stemming from the L.P.R. hit, which contradicted his earlier statement that he did not leave the house on the night of his wife's murder. In support, he cites to State v. Diaz, where we reasoned that the Miranda waiver was not voluntary because the police deliberately misled the defendant as to his status by stating that they were "conducting an investigation involving narcotics" when "[they] were aware of facts constituting probable cause to believe defendant committed . . . [a] drug-induced death offense." 470 N.J. Super. 495, 503, 506 (App. Div. 2022).

Lastly, defendant argues the detectives' actions in "leverag[ing] the . . . polygraph" test to obtain his statement without informing him that the test was inadmissible as evidence at trial without his consent, renders his Miranda waiver

involuntary. See State v. McDavitt, 62 N.J. 36, 46 (1972) (noting that the admissibility of polygraph results requires stipulations from both parties); State v. A.O., 198 N.J. 69, 92 (2009) (quoting United States v. Scheffer, 523 U.S. 303, 312 (1998)) (noting that "certain doubts and uncertainties plague even the best polygraph exams"). Defendant avers that his lack of knowledge of the polygraph test's admissibility led him to believe "it would be futile to keep silent"; thereby making him unknowingly waive his Miranda rights.

B. Analysis

We initially note that we have no concerns regarding the motion court's factual findings about defendant's Miranda waiver on March 13. However, based on our de novo review of the motion court's legal conclusions flowing from the facts, see S.S., 299 N.J. at 380, we conclude that based on the totality of the circumstances defendant did not knowingly, intelligently, and voluntarily waive his Miranda rights.

Our decision is guided by settled case law regarding the type of law enforcement conduct that renders a defendant's Miranda waiver involuntary and necessitates suppression. Any "'evidence that the accused was threatened, tricked, or cajoled into a waiver' of his privilege will render the [Miranda] waiver involuntary." Nyhammer, 197 N.J. at 407 (quoting Miranda, 384 U.S. at

17

476). A false promise of leniency may be coercive if the lie, "under the totality of circumstances, ha[s] the capacity to overbear a [defendant's] will." State v. L.H., 239 N.J. 22, 44-45 (2019). Police may not "directly or by implication" tell a defendant that their statement won't be used against them. Id. at 44. For a confession to be involuntary due to physical contact or stress, it must rise to the level of "physical punishment or mental exhaustion" that deprives a defendant of free will. Presha, 163 N.J. at 313 (quoting Miller, 76 N.J. at 402).

Defendant's contentions—that he was hungry during the interrogation, he was not allowed to see his daughter, he was cold, detectives made repeated physical contact with him, and that he was told confessing would benefit him—individually do not justify suppression. Although there were some delays, the police provided him with pizza and water, permitted him to use the bathroom, and provided breaks in between questioning. See State v. Cabrera, 387 N.J. Super. 81. 100 (App. Div. 2006) (holding that an eighteen-year-old defendant's confession was voluntary after being questioned for eight hours, because the questioning was not continuous, police provided food and drink, and the defendant was not tired because he worked at night). Defendant also fails to show that brief physical contact or not being allowed to see his daughter rose to the level of "physical punishment or mental exhaustion" depriving him of the

free will to refuse to talk. Presha, 163 N.J. at 313. There is no indication that police physically abused him to force him to talk to the detectives. As for his daughter, although he asked to check on her, there was no indication defendant believed his daughter was in an unsafe situation, was not being properly cared for while he was being questioned, or that police used his daughter as a pawn to compel him to talk. Moreover, there is no indication police explicitly told defendant that speaking to them would benefit him. Instead, the police stated: "I'm trying to help you" and "[y]ou don't want to look like the monster at the end of the day . . . . You don't want to be that guy. We're trying to help you not be that guy today." Such tactics have been considered lawful and not inherently coercive. See Miller, 76 N.J. at 403 (police are allowed to "dissipate [a defendant's] reluctance [to talk] and persuade [them] to talk").

Defendant's argument that detectives misled him as to his true legal status—telling him the interview would last for ten to fifteen minutes, interviewing him for eight hours while knowing they had probable cause to arrest him for providing false information—lacks merit. He was advised of his Miranda rights, including that he could stop the questioning at any time. There is no indication his will was overborne solely by the interrogation's length exceeding the fifteen minutes he was initially told.

Individually, the fact that detectives repeatedly told defendant that he failed the polygraph test is not a meritorious basis for rendering defendant's waiver involuntary. See State v. Timmendequas, 161 N.J. 515, 609, 617-18 (1999), cert. denied, 534 U.S. 868 (2011)(determining a defendant's statements were voluntary notwithstanding the fact that police confronted him with polygraph results showing he failed the test). Although, the Miranda warnings given to defendant on March 5 and March 13 did not clarify that the polygraph test results would be inadmissible without his consent they did inform him that any statement he gave could be used against him. We have found no error in a trial court's conclusion that defendant freely and voluntarily waived his Miranda rights after a defendant was given a computer voice stress analyzer[5] (CVSA) and the detectives pointed out that it appeared he was not being entirely candid in his denial of the allegations. State v. R.T., 411, N.J. Super 35, 45-46 (App. Div 2009). In R.T., we held that this type of interrogation "does not rise to the level of trickery by resorting to fabricated evidence of the type that was disapproved in State v. Patton, 362 N.J. Super. 16, 31-49 (App. Div. 2003), certif. denied,

---

[5] A voice stress analyzer is different from a polygraph. A voice stress analyzer measures fluctuations or tremors in a person's voice, whereas polygraphs measure a person's heart rate, blood pressure, and respiration. See Clifford S. Fishman & Anne Toomey McKenna, Jones on Evidence §§ 58.1, 58.9 (7th ed. 2003).

20

178 N.J. 35 (2003) (citations reformatted), <u>even though a CVSA is not always reliable and is inadmissible at trial</u>." (Emphasis added).

However, when all these individual assertions are taken as a whole, the State did not prove beyond a reasonable doubt that defendant's entire statement was given voluntarily and that the defendant's will was not overborne by police coercion. <u>State v. Knight</u>, 183 N.J. 449, 462 (2005). The following six reasons taken together lead us to that conclusion: (1) defendant was told to expect ten to fifteen minutes of follow-up questions but was held for over eight hours during which he was at times cold and hungry, had to wait long periods between bathroom breaks, and was not provided any food until halfway through the interrogation; (2) defendant was not allowed to see or check in on his daughter at any point during the interrogation; (3) the detectives repeatedly made minor physical contact with defendant; (4) the detectives suggested that confessing to what he did to his wife would benefit him, contradicting the Miranda warnings; (5) the detectives misled defendant as to his true legal status by tricking him into coming to the police station for just ten-to-fifteen minutes of follow-up questions when in reality they already had probable cause to arrest him for giving false information to a law enforcement officer; and (6) they leveraged the polygraph test to obtain defendant's statement while failing to tell defendant the

21

polygraph was inadmissible absent defendant's consent. Thus, the totality of the circumstances leads us to the conclusion that the March 13 statement must be suppressed.

IV.

Admission of Evidence of Karla's Body

A. Defendant's Contentions.

Defendant contends that evidence of his wife's body in Chatham should be suppressed as fruit of the poisonous tree because the Supreme Court's decision suppressing his March 19 statement disclosing the body's location was obtained in violation of his constitutional right to counsel.[6] He avers the motion court erred in determining the State satisfied its burden under State v. Sugar, 100 N.J. 214, 238–40 (1985) (Sugar II), in applying the inevitable discovery doctrine to admit Karla's body to prove his guilt.[7] He emphasizes there is no

---

[6] Before this court and the Supreme Court, defendant appealed admission of his March 19 statement but did not challenge the admission of the evidence of his wife's body. See Rivas, 251 N.J. at 139. However, the Court recognized that "[o]n appeal, [defendant] 'concede[d] that Karla's body would inevitably have been found.'" Id. at 147, n.4 (second alteration in original).

[7] Based on its determination that the March 19 statement was not suppressed, the trial court denied the motion to suppress the Karla's body, finding that: (1) under Patane, "defendant's voluntary and properly warned statements given on March 19 render evidence of the body admissible, [because it was] wholly

proof that the police investigation of the whereabouts of his car through the use of L.P.R., his portable GPS device, and his cell phone usage on the night of February 23 and early morning of February 24 would have revealed he was in Chatham, a town which he had no connection to and was a thirty-minute drive from his Elizabeth apartment. Defendant also stresses "there is no clear and convincing evidence that [private parties] would have discovered [Karla's] body [on their own]."

B. Inevitable Discovery Doctrine

The inevitable discovery doctrine allows for the admission of evidence that would otherwise be suppressed under "[t]he fruit-of-the-poisonous-tree doctrine [which] denies the prosecution the use of derivative evidence obtained as a result of a Fourth or Fifth Amendment violation." O'Neill, 193 N.J. at 171 n.13; see also State v. James, 346 N.J. Super. 441, 453 (App. Div. 2002) ("Where . . . physical evidence is discovered as a result of information gained during the course of an illegally obtained confession, the fruit of the poisonous tree

---

independent from and not derivative of the March 18 suppressed statement;" and (2) under State v. James, 346 N.J. Super. 441(App. Div. 2002), there was "clear and convincing evidence, that both law enforcement and private persons would have inevitably discovered the deceased body of [Karla] in the Chatham Township residence, and that the discovery would have occurred completely independent of the information provided by . . . defendant on March 18."

A-2113-24

doctrine is implicated."). The doctrine "prevent[s] the prosecution from being in a better position than if the illegal conduct had not taken place," it does not "punish the prosecution by putting it in a worse place." State v. Caronna, 469 N.J. Super. 462, 500 (App. Div. 2021) (emphasis omitted) (quoting State v. Camey, 239 N.J. 282, 302 (2019)).

Allowing the admission of evidence through inevitable discovery doctrine is designed "to reasonably accommodate and harmonize . . . the State's interest in assuring that those who have violated our criminal laws receive their just punishment and . . . the deterrent purpose of the exclusionary rule." James, 346 N.J. Super. at 454.

A seminal case involving inevitable discovery is Sugar III. There, the police unlawfully obtained a search warrant for the defendant's property where they discovered the body of his wife in a shallow grave. Sugar III, 108 N.J. at 153. The trial court found that the body would not have been inevitably discovered because, although the defendant had previously agreed to sell the property to a third party, the sale had not been completed by the time the body was discovered and therefore he would likely "not make any effort to sell the property, given the greater risk that the victim's body would then be discovered." Id. at 160. The Supreme Court reversed, finding there was no evidence

defendant was hesitating on the sale of the property and accordingly reasoned that the third party would have inevitably discovered the body because the ground where the body was buried would have appeared noticeably different than the ground surrounding it, and the smell of the body would have been noticeable by people and attracted animals including the dog of the would-be buyers. Id. at 161.

To invoke inevitable discovery, the Court reiterated that the State must prove by clear and convincing evidence that:

> (1) [P]roper, normal and specific investigatory procedures would have been pursued in order to complete the investigation of the case; (2) under all of the surrounding relevant circumstances the pursuit of those procedures would have inevitably resulted in discovery of the evidence; and (3) the discovery of the evidence through the use of such procedures would have occurred wholly independently of the discovery of such evidence by unlawful means.
>
> [Sugar III, 108 N.J. at 156-57 (quoting Sugar II, 100 N.J. at 235).]

Relevantly, the doctrine also applies "where disputed evidence inevitably would have been discovered by a private party rather than by the police." Ibid.

For the State to overcome the exclusion of finding Karla's body because it was obtained from defendant's unconstitutionally obtained confession it

A-2113-24

need not demonstrate the exact circumstances of the evidence's discovery. It need not establish the exclusive path leading to the discovery. . . . The State need only present facts or elements—proving each such fact or element by a preponderance of the evidence— that in combination clearly and convincingly establish the ultimate fact and lead to the conclusion that the evidence would be inevitably discovered.

[Id. at 158-59.]

C. Analysis

It is clear that Karla's body is fruit of the poisonous tree stemming from defendant's now-suppressed March 18 statement. During defendant's interrogation on March 18, after he invoked his right to counsel, he revealed the location of Karla's body "with such specificity that law enforcement was able to locate the home." The police located her body "the night of the 18th into the morning of the 19th," before his follow-up interrogation on the 19th. The trial court suppressed the March 18 statement because the detectives "failed to honor [defendant's] right to counsel," Rivas, 251 N.J. at 151, by continuing to interrogate him resulting in a constitutional violation. Therefore, the body is the fruit of the unlawful March 18 interrogation and is inadmissible absent an exception. See James, 346 N.J. Super. at 453 ("Where . . . physical evidence is discovered as a result of information gained during the course of an illegally obtained confession, the fruit of the poisonous tree doctrine is implicated.").

We agree with defendant that the State has not met its burden to admit evidence of Karla's body under the inevitable discovery doctrine on the basis that her body would have been discovered by the police investigation independent of defendant's March 19 confession. Rather, we conclude the doctrine applies, and the body is admissible because Karla's body would have been found by private parties independent of the March 19 disclosure.

The State satisfies the inevitable discovery doctrine's first prong by showing it would have pursued "proper, normal, and specific investigatory procedures" to locate Karla's body absent the unlawful interrogations of defendant on March 18 and March 19. Sugar III, 108 N.J. at 156-57. However, it does not satisfy the second prong that the "pursuit of those procedures would have inevitably resulted in the discovery of the evidence." Ibid.

The State has offered no clear and convincing evidence that the anticipated search warrants to ascertain where defendant's car had traveled the night or early morning he disposed of his wife's body would have led it to 9 Southern Boulevard where defendant dumped her body. Indeed, defendant could have avoided toll roads, and there is no evidence that he used his portable GPS device or cell phone on the night/early morning in question. And the sole L.P.R. data showing that defendant's car was on Division Street in Elizabeth that

the State produced does not establish defendant was in Chatham, let alone 9 Southern Boulevard. Because the State abandoned these investigative efforts after defendant confessed, the State can only speculate as to what information would have been obtained.

The situation here is a far cry from State v. Johnson where during an unlawful confession, the defendant told detectives that the murder weapon was under his mattress in his room. 120 N.J. 263, 288 (1990). Applying the inevitable discovery doctrine, our high Court concluded the weapon was admissible because, prior to the confession, a detective was preparing an affidavit for a search warrant of the defendant's home. Id. at 290. Unlike in Johnson, there is no clear and convincing evidence that the information the police obtained from their search warrants would have indicated the location of Karla's body.

Furthermore, the State's use of flyers, media coverage, and door-to-door canvassing to ask the community for relevant information are insufficient proof the efforts would have led to locating Karla's body. There is no evidence these efforts resulted in any tips. See Contra Nix v. Williams, 467 U.S. 431, 448-49 (1984) (holding that the victim's body would have inevitably been found by a

200-person search party who ended their search within two and one-half miles from the body after defendant volunteered the location to police).

Simply put, the State's contention that their investigative techniques would have led them to Karla's body is purely speculative.

The inevitable discovery doctrine, however, allows evidence of Karla's body because there is clear and convincing evidence that her body would have been found by private parties who would have reported it to the police. Even though 9 Southern Boulevard was abandoned when Karla's body was left there, there is clear and convincing evidence—as the trial court found—that the property owner Carbone, dispossessed tenant McClay, and neighboring tenant Ellison, regularly visited the property during the time period in question. In addition, as in Sugar III, the odor of the body would have become apparent to either of them.

Accordingly, the motion judge's order allowing evidence of Karla's body should stand.

Affirmed in part and reversed and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-2113-24